[No. C020118. Third Dist. Feb. 19, 1997.]

BOARD OF ADMINISTRATION OF THE PUBLIC EMPLOYEES'
RETIREMENT SYSTEM et al., Plaintiffs and Respondents, v.
PETE WILSON, as Governor, etc., Defendant and Appellant;
ASSOCIATION OF CALIFORNIA STATE ATTORNEYS AND
ADMINISTRATIVE LAW JUDGES et al., Interveners and Respondents.

1114

## COUNSEL

Christian M. Keiner for Defendant and Appellant.

Schachter, Kristoff, Orenstein & Berkowitz, John D. Adkisson, Drew R. Liebert, Nossaman, Guthner, Knox & Elliott, Richard H. Koppes and Kayla Gillan for Plaintiffs and Respondents.

Dennis F. Moss for Interveners and Respondents.

## OPINION

**SIMS, Acting P. J.**—This litigation arises from changes in the way the Legislature has funded the California Public Employees' Retirement Fund (PERF). Until 1990, the state paid employer contributions to the PERF on a monthly basis. In 1990, the Legislature changed the payment schedule from monthly to quarterly. In 1991, the Legislature temporarily changed the payment schedule from quarterly to semiannually for one year only. Legislation in 1992 changed the schedule to "semiannually, six months in arrears." Legislation in 1993 changed the schedule to "annually, 12 months in arrears." (Gov. Code, § 20822.)[1]

A mandamus action was brought in the trial court, challenging "in arrears" financing on various grounds, including violation of the constitutional right

---

[1]Undesignated statutory references are to the Government Code.

Section 20822 contains the substance of former section 20751, which was cited by the parties but which was repealed and renumbered effective January 1, 1996, in a legislative reorganization of the Public Employees' Retirement Law (PERL). (Stats. 1995, ch. 379, § 1.) In reorganizing PERL, the Legislature stated: "It is not the intent of the Legislature to make any substantive change in the law." (Stats. 1995, ch. 379, § 5.)

Section 20822 now provides in part: "From the General Fund in the State Treasury there is appropriated annually, *12 months in arrears*, on July 1 of each fiscal year, beginning July 1, 1994, to the retirement fund the state's contribution for [designated members]." (Italics added.)

As will appear, this litigation involves both the "12 months in arrears" feature and a prior "six months in arrears" feature in former section 20751.

to be free of impairment of contracts. (U.S. Const., art. I, § 10;[2] Cal. Const., art. I, § 9.[3]) The trial court determined "in arrears" financing is an unconstitutional impairment of contract.

Appellant Pete Wilson, Governor of the State of California, appeals from a judgment in favor of the Board of Administration of the California Public Employees' Retirement System (the PERS Board), individually and as trustee of PERF on behalf of PERS members and beneficiaries, and William D. Crist, PERS member and president of the PERS Board (hereafter collectively PERS).[4]

Appellant contends the trial court erred in determining that the "in arrears" pension financing is an unconstitutional impairment of contract. Appellant also raises issues of standing, statute of limitations, laches, and propriety of directing the transfer of state funds. We shall conclude PERS members have a contractual right to an actuarially sound retirement system and the "in arrears" pension financing unconstitutionally impaired that contractual right. We shall therefore affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

This litigation involves two sequential versions of a provision of the Public Employees' Retirement Law, section 20822 (former § 20751). Senate Bill No. 1107, 1991-1992 Regular Session,[5] enacted in 1992, provided that state employer contributions from the General Fund would be paid to the

---

[2]The United States Constitution, article I, section 10, provides in part: "No state shall . . . pass any . . . law impairing the obligation of contracts . . . ."

[3]California Constitution, article I, section 9 provides in part: "A . . . law impairing the obligation of contracts may not be passed."

[4]Other named defendants—State Controller Gray Davis and State Treasurer Kathleen Brown—did not appeal from the judgment.

The following parties are designated in the judgment as plaintiffs in intervention: Association of California State Attorneys and Administrative Law Judges, California Association of Professional Scientists, Professional Engineers in California Government, California Department of Forestry Employees Association, and Retired Public Employees' Association. The interveners filed a brief joining in PERS's appellate brief.

California State Employees Association (CSEA) appeared as amicus curiae in the trial court.

[5]Senate Bill No. 1107 amended former section 20751 to read in part: "From the General Fund in the State Treasury there is appropriated *semiannually, six months in arrears*, on January 1 and July 1 of each fiscal year, to the Retirement Fund the state's contribution for: [designated members whose compensation is paid from the General Fund]." (Stats. 1992, ch. 707, § 2, eff. Sept. 14, 1992, italics added.)

PERF semiannually, six months in arrears. Senate Bill No. 240, 1993-1994 Regular Session,[6] enacted in 1993, set pension financing at 12 months in arrears.[7]

"In 1931 the Legislature established the State Employees' Retirement System, presently known as PERS. [Citations.] . . . [¶] The system was administered by a board of administration. At the outset the PERS Board was directed to make actuarial valuations of the fund and the liabilities of the system and to recommend to the Legislature appropriate changes in the rates of contribution to achieve equality between valuation and liabilities. [Citation.]"[8] (*Claypool* v. *Wilson* (1992) 4 Cal.App.4th 646, 653-654 [6 Cal.Rptr.2d 77].) As early as 1947 the Legislature specified actuarially determined compulsory contributions. Since 1968, the PERS Board has been empowered to adjust the rates of employer contributions in accordance with its actuarial determinations. The retirement law requires the Governor to include the actuary's contribution rates in the budget and requires the Legislature to adopt the actuary's contribution rates and authorize the budget appropriation. (§ 20814, former § 20750.905.)

Until 1990, the state's employer contributions were transferred to the retirement fund on a monthly basis, on the first of every month immediately following the end of a pay period. (Former § 20751, enacted by Stats. 1970, ch. 346, § 29, p. 748.)

In 1990, the Legislature (with PERS Board input and approval) changed the payment schedule from monthly to quarterly, payable on the first day of the calendar quarter for wages earned during the previous quarter. (Stats. 1990, ch. 463, § 3, p. 2024.) At the same time, PERS members received a new advantage, in that retirement benefits would be calculated based on an employee's highest earnings in the 12-month period before retirement, as

[6]Senate Bill No. 240 amended former section 20751 to provide in part: "From the General Fund in the State Treasury there is appropriated *annually, 12 months in arrears,* on July 1 of each fiscal year, beginning July 1, 1994, to the Retirement Fund the state's contribution for: [designated members whose compensation is paid from the General Fund]." (Stats. 1993, ch. 71, § 1, eff. June 30, 1993, italics added.)

[7]Both Senate Bill No. 1107 and Senate Bill No. 240 affect General Fund employees only, not Special Fund employees.

[8]In June 1984, the voters adopted Proposition 21, which among other things amended the California Constitution, article XVI, section 17, to provide that PERS's assets be deemed trust funds held for the exclusive purposes of providing pension/retirement benefits and defraying reasonable expenses of the system. Ballot pamphlet arguments in favor of Proposition 21 stated the initiative would " 'give public pension assets full constitutional protection as trust funds' and 'guarantee[] that neither the Governor nor future Legislatures will ever be able to use this money for other purposes.' "

California Constitution, article XVI, section 17, is not directly at issue in this appeal, since the trial court found Senate Bill No. 1107 and Senate Bill No. 240 were not unconstitutional under this provision, and PERS has not cross-appealed from that ruling.

opposed to the previous method whereby benefits were calculated based on compensation over a three-year period. (Stats. 1990, ch. 1251, § 2, pp. 5270-5271.) The 1990 legislation also provided for PERS to adopt a 40-year amortization period for calculating contribution rates. (Stats. 1990, ch. 1251, § 6, p. 5272; Stats. 1990, ch. 463, § 1, p. 2024.)

In 1991, the Legislature temporarily changed the State's contribution schedule from quarterly to semiannually for one year only, the 1991-1992 fiscal year. (§ 20823, repealed by Stats. 1996, ch. 906, § 101, formerly § 20751.5, Stats. 1991, ch. 83, § 33 (Assem. Bill No. 702 (1991-1992 Reg. Sess.).) Contributions were transferred on January 31, 1992, and June 30, 1992. Assembly Bill No. 702 contained a sunset provision whereby quarterly payments were to be restored in the 1992-1993 fiscal year. (*Ibid.*) Assembly Bill No. 702 contained specific legislative findings as follows: "The Legislature finds and declares that this section will not affect the soundness of the retirement fund, in that the change to semiannual payments is on a one-time basis and any resulting loss to that fund will be accounted for by increased employer contributions in subsequent years." (§ 20823, subd. (b) [former § 20751.5].) The validity of the 1991 legislation is not at issue in this appeal.[9]

In September 1992, the Legislature responded to mounting budget pressures by enacting as urgency legislation Senate Bill No. 1107, which amended former section 20751 to provide that the state's employer contributions for General Fund employees were to be made "semiannually, six months in arrears."[10] (Stats. 1992, ch. 707, § 2.) Thus, contributions for fiscal year[11] 1992-1993 would be paid on July 1, 1993, and January 1, 1994. Senate Bill No. 1107's "in arrears" financing differed from the prior "level contribution" system, whereby payments flowed to the retirement fund as liability was incurred for future pension obligations.

In June 1993 (before any contributions were paid under Senate Bill No. 1107), Senate Bill No. 240 (see fn. 6, *ante*) was signed into law as urgency legislation. (Stats. 1993, ch. 71.) Senate Bill No. 240 amended former section 20751 to provide that state employer contributions for General Fund employees be made "annually, 12 months in arrears." Thus, for example, employer contributions for the 1994-1995 fiscal year would not be paid until July 1996.

"In arrears" financing differs from the prior system. Under the prior system, known as a "level contribution" system, payments flowed to the

[9]Other provisions of Assembly Bill No. 702 were the subject of litigation in *Claypool* v. *Wilson, supra,* 4 Cal.App.4th 646.

[10]Senate Bill No. 1107 also contained provisions regarding retirement programs of local agencies, which are not at issue in this appeal. (Stats. 1992, ch. 707, §§ 1, 3-6.)

[11]The fiscal year runs from July 1 to June 30 of the following calendar year.

retirement fund as liability was incurred for future pension obligations. Under the "in arrears" system, contributions would not be paid during the same fiscal year that employee services were rendered.

As a result of Senate Bill No. 1107 and Senate Bill No. 240, employer contributions (amounting to $910 million) which would have been paid during fiscal years 1992-1993 and 1993-1994 were not paid during those fiscal years.

While these events were taking place, there was also activity on another front. Thus, in November 1992 (after enactment of Senate Bill No. 1107 but before enactment of Senate Bill No. 240), the voters adopted Proposition 162, which among other things added to California Constitution, article XVI, section 17, the requirement that the PERS Board have "sole and exclusive power to provide for actuarial services in order to assure the competency of the assets of the public pension or retirement system." (Cal. Const., art. XVI, § 17, subd. (e).) Proposition 162 contained a statement of "Findings and Declaration," which stated in part: " 'Politicians have undermined the dignity and security of all citizens who depend on pension benefits . . . by repeatedly raiding their pension funds. . . . [¶] . . . To protect the financial security of retired Californians, politicians must be prevented from meddling in or looting pension funds.' " (Historical Notes, 3 West's Ann. Const. (1996 ed.) art. XVI, § 17, p. 114 [Prop. 162, § 2, subds. (c)-(d)].) Proposition 162 also contained a statement of "Purpose and Intent," in which the voters declared their purpose and intent in passing Proposition 162 was, inter alia, " 'to strictly limit the Legislature's power over [public pension] funds, and to prohibit the Governor or any executive or legislative body of any political subdivision of this state from tampering with public pension funds." (Historical Notes, 3 West's Ann. Const., *supra*, art. XVI, § 17, p. 114 [Prop. 162, § 3, subd. (e)].)

In April 1994, PERS filed a petition for writ of mandate and complaint for declaratory relief, alleging that Senate Bill No. 1107 and Senate Bill No. 240 were unconstitutional under California Constitution, article XVI, section 17[12] and were unconstitutional impairments of contract under the United States Constitution, article I, section 10 (fn. 2, *ante*), and the California

---

[12]California Constitution, article XVI, section 17, confers on the PERS Board "plenary authority and fiduciary responsibility for investment of moneys and administration of the system" and provides the PERS Board shall have "the sole and exclusive fiduciary responsibility" and "sole and exclusive power to provide for actuarial services in order to assure the competency of the assets of the public pension or retirement system."

As indicated, the trial court found Senate Bill No. 1107 and Senate Bill No. 240 were not unconstitutional under this provision. PERS has not cross-appealed from that determination, and we have no need to consider any issue regarding that determination, because we shall affirm the trial court's decision that Senate Bill No. 1107 and Senate Bill No. 240 were unconstitutional impairments of contract.

Constitution, article I, section 9 (fn. 3, *ante*). The pleading named as defendants the Governor, the State Controller, and the State Treasurer, in their official capacities. PERS requested that the trial court issue a peremptory writ of mandate implementing former section 20751 as it existed prior to the enactment of Senate Bill No. 1107 and Senate Bill No. 240. The trial court granted a motion to intervene by the Association of California State Attorneys and Administrative Law Judges, California Association of Professional Scientists, Professional Engineers in California Government, California Department of Forestry Employees Association, and Retired Public Employees' Association.

In October 1994, PERS filed a consolidated motion for summary judgment/summary adjudication of issues, and a motion in support of writ of mandate, seeking consequential damages on the declaratory relief cause of action. Extensive evidence was submitted with the moving and opposing papers on both sides.

A hearing was held in November 1994. The trial court denied summary judgment/summary adjudication (which is not at issue on appeal) and issued a statement of decision on the writ proceeding. The trial court determined Senate Bill No. 1107 and Senate Bill No. 240 were not unconstitutional under California Constitution, article XVI, section 17. Although the security of the pension system was affected, "this is a matter properly addressed in the 'contractual' aspect of [PERS's] constitutional claims." However, the trial court determined that Senate Bill No. 1107 and Senate Bill No. 240 both constituted unconstitutional impairments of contract.

In January 1995, the trial court issued its statement of decision, which included the following:

1. Since its inception, the fundamental funding premise of PERS has been the "level contribution" system, whereby retirement obligations are paid for as liability therefore is incurred (not as the obligations mature). "The objective of the level contribution system is to receive approximately level contributions from year to year and from generation to generation, which, in turn and in general, depends upon a consistent and predictable stream of payments, paid in the same fiscal year for which they are calculated."

2. The change from the monthly payment basis to the quarterly payment basis was accompanied by a corresponding significant advantage to PERS members and was approved by the PERS Board.

3. The state has an obligation not to alter employer contributions without actuarial input from the PERS Board in a timely manner. When employer contributions are paid later than actuarially anticipated, less money is generated for the retirement fund, resulting in an immediate shortfall. As a result

of Senate Bill No. 1107 and Senate Bill No. 240, no employer contribution payments were made by the state on behalf of General Fund employees during fiscal years 1992-1993 and 1993-1994. The fiscal year 1992-1993 payment was ultimately made on or about July 1, 1994. Employer contribution rates were appropriated in the 1994-1995 Budget Act but, pursuant to Senate Bill No. 240, will not be made until July 1996. Under Senate Bill No. 240, all future payments will be paid on the average 16-1/2 months later than on the quarterly system. Under Senate Bill No. 1107, had it been implemented, the payments would have been delayed approximately seven and one-half months. "[U]nder either SB 240 or SB 1107, in the absence of considerable (and at this point speculative) mitigation efforts, the value of the contribution payments will be lower than that which would have been due for the same fiscal year under the quarterly system."

4. The changes in payment schedule of Senate Bill No. 1107 and Senate Bill No. 240 were accomplished "without approval of, actuarial input from, or consideration by the [PERS] Board." The trial court found no evidence to support the Governor's contention that the PERS Board established an actuarial predicate for, or acquiesced in, the legislative changes. The court said: "Assuming the relevance of the evidence of [PERS] staff participation in the legislative process, and giving [appellant] the benefit of every conceivable inference arising therefrom, no such inference rises to the dignity of Board action—which is the prerequisite to appropriate legislative action in this context."[13]

5. The purpose of Senate Bill No. 1107 and Senate Bill No. 240 was to balance the budget, not to reform or improve the pension system. The "in arrears" financing was not accompanied by any comparable new advantage to PERS members.

6. The effect of Senate Bill No. 1107 and Senate Bill No. 240 has been to impair the state's obligation to maintain an actuarially sound retirement

---

[13]As indicated in points 3 and 4 above, the trial court found the Legislature was required to but failed to obtain actuarial input from the PERS Board before enacting Senate Bill No. 1107 and Senate Bill No. 240, and this failure to obtain PERS Board input constituted an additional violation of the contract clause. Appellant challenges (1) the trial court's determination that PERS Board input was required, and (2) the court's factual finding that PERS Board input was not obtained.

We have no need to and do not reach the legal question whether PERS Board input was required as a contractual component of constitutional dimension. However, regardless of whether PERS Board input was required as a contractual component, the Legislature's failure to obtain actuarial input from the PERS Board may properly be considered as a factor is assessing other matters, such as appellant's argument that legislation impairing contract rights may nevertheless be sustained on the grounds of necessity (i.e., emergency). As we discuss *post*, the necessity defense contemplates that the state sought alternative, less drastic means of meeting the necessity. If the state did not avail itself of the PERS Board's expertise by seeking actuarial input from the PERS Board, appellant is in a poor position to argue that the state explored less drastic means of meeting any emergency. Substantial evidence in support of the trial court's factual finding regarding the lack of PERS Board input is found in the declarations of PERS Board President William Crist and PERS Assistant Executive Officer Robert Walton.

fund. "The testimony—including that of [appellant's] actuary—establishes that unless substantial mitigating steps are taken, the Fund will never recoup the losses caused by the postponement of the 1992-93 and 1993-94 payments and the continuing 'in arrears' method of payment. In this determination, the Court may not properly speculate with regard to potential future mitigating matters."

7. The interferences are substantial—not minimal. Even if it be assumed that the record justifies a finding of a fiscal "emergency," the subject legislation was enacted without actuarial input from the PERS Board, and without indication that considered thought was given to possible mitigating measures, or to the possibility of alternative, less drastic means of accomplishing the goal of budget balancing.

The trial court entered judgment directing issuance of a writ commanding the Governor, Controller and Treasurer (1) to disregard Senate Bill No. 1107 and Senate Bill No. 240 and return to the quarterly payment system, and (2) to take all necessary action to transfer to the retirement fund the employer contribution amounts appropriated in the 1993-1994 and 1994-1995 Budget Acts but unpaid as of the date of trial.[14] The writ issued on January 13, 1995.[15]

The Governor appeals from the judgment on the contract clause claim.[16]

## DISCUSSION

### I. *Standing*

Appellant contends the PERS Board and Crist in his official capacity as PERS Board president lack standing to challenge Senate Bill No. 1107 and Senate Bill No. 240, and the trial court erred in concluding otherwise.[17]

However, in this case, we do not have to decide (and we do not) whether the PERS Board has standing. Appellant concedes the interveners have

---

[14]The 1992-1993 contribution of $445 million was transferred to the PERF on or about July 1, 1994.

[15]The trial court found PERS was entitled to prejudgment interest, but the court said it was unable to compel vindication of that right, because there was insufficient evidence that money to pay the interest had been appropriated and was available. The parties do not challenge that determination on appeal.

[16]On December 21, 1995, appellant filed along with his reply brief a request for judicial notice of a California Public Employees' Retirement System Comprehensive Annual Financial Report dated June 30, 1994, which assertedly was not available during the trial court proceedings. We note the hearing in this case was held November 18, 1994. Appellant fails to state when the report became available and fails to explain why he waited until December 21, 1995, to request judicial notice in this court. We therefore deny appellant's request for judicial notice.

[17]Appellant argues the standing problem is "aggravated by the Board continuing to seek $363,898.82 in 'civil rights' attorneys' fees and costs against the State of which it is a part." However, we see nothing in the cited portion of the record regarding attorney's fees and costs.

The question of attorney's fees and costs is the subject of a separate appeal pending in this court. (*Board of Adminisration* v. *Wilson* (C021663, app. pending).)

standing. Moreover, appellant does not dispute that Crist has standing in his individual capacity as a PERS member. The pleading was filed not only by the PERS Board and Crist in his official capacity, but also by Crist in his individual capacity. The pleading stated: "Dr. Crist is . . . a [PERS] state miscellaneous member whose salary is paid from the General Fund. As an active state employee and member of the Retirement System, Dr. Crist is within the class of persons beneficially interested in respondents'/defendants' faithful performance of their legal duties. Dr. Crist has a particular interest to be preserved or protected which is independent of the interest held by the public at large."

Since appellant does not challenge Crist's standing in his individual capacity (nor the standing of the intervenors), the judgment is not defective for lack of standing, and we need not address appellant's contention further. For convenience, we shall refer to the respondents collectively as "PERS."

II. *Statute of Limitations*

■ Appellant argues PERS is barred from attacking Senate Bill No. 1107 by the statute of limitations. We disagree.

Appellant relies only on section 911.2, which assertedly required PERS to file a claim with the public entity within one year of accrual.[18]

PERS (including Crist in his individual capacity) filed a claim with the Board of Control on December 30, 1993. The claim challenged both Senate Bill No. 1107 and Senate Bill No. 240. Appellant points out Senate Bill No. 1107 became effective September 15, 1992, more than one year before the claim was filed.

However, we agree with the trial court that the Board of Control claim was not necessary, because the primary outcome sought was not money or damages, but an order compelling performance of a mandatory duty. (*Eureka Teacher's Assn.* v. *Board of Education* (1988) 202 Cal.App.3d 469, 475-476 [247 Cal.Rptr. 790] [teacher's claim for backpay was incidental to mandamus action for reemployment and thus exempt from claim-filing requirement]; *County of Sacramento* v. *Lackner* (1979) 97 Cal.App.3d 576, 587 [159 Cal.Rptr. 1] [mandamus action to compel state officer to disburse funds to county under Medi-Cal statutes was exempt from claim-filing requirement];

---

[18]Section 911.2 provides: "A claim relating to a cause of action for death or for injury to person or to personal property or growing crops shall be presented as provided in Article 2 (commencing with Section 915) of this chapter not later than six months after the accrual of the cause of action. A claim relating to any other cause of action shall be presented as provided in Article 2 (commencing with Section 915) of this chapter not later than one year after the accrual of the cause of action."

*Forde* v. *Cory* (1977) 66 Cal.App.3d 434 [135 Cal.Rptr. 903] [mandamus proceeding to compel state officer to pay lump sum death benefit on behalf of judge who died before retirement was a suit to compel performance of express statutory duty, not a money action, and thus was exempt from the claim-filing requirement].) "An action in traditional mandamus, which seeks an order compelling an official to perform a mandatory duty, is not an action against the state for money, even though the result compels the public official to release money wrongfully detained." (*County of Sacramento* v. *Lackner*, *supra*, 97 Cal.App.3d at p. 587.)

This action sought performance of a mandatory duty, and the judgment in this case ordered issuance of a writ directing return to the quarterly payment schedule and transfer to the retirement fund of all payments due under that schedule. The action was thus exempt from the claim-filing requirement.

We conclude appellant has failed to show the case is barred by the statute of limitations.

III. *Laches*

 Appellant argues laches bars the attack on Senate Bill No. 1107, because PERS delayed almost 19 months after enactment of Senate Bill No. 1107 before filing suit, and PERS executives assertedly participated in the decisionmaking process which resulted in enactment of Senate Bill No. 1107. We disagree.

The trial court rejected the laches claim, finding appellant "has failed to establish prejudice due to delay in filing the writ petition, and has failed to establish that [PERS] acquiesced in the passage and implementation of the legislation."

 "The defense of laches requires unreasonable delay plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay." (*Conti* v. *Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 359 [82 Cal.Rptr. 337, 461 P.2d 617], fns. omitted.) "[U]nreasonable delay by the plaintiff is not sufficient to establish laches. There must *also* be prejudice to the defendant resulting from the delay or acquiescence by the plaintiff." (*Ragan* v. *City of Hawthorne* (1989) 212 Cal.App.3d 1361, 1368 [261 Cal.Rptr. 219], original italics, fn. omitted.) "Prejudice is never presumed; rather it must be affirmatively demonstrated by the defendant in order to sustain his burdens of proof and the production of evidence on the issue. [Citation.] Generally speaking, the existence of laches is a question of fact to be determined by the trial court in light of all of the applicable circumstances, and in the absence of manifest

injustice or a lack of substantial support in the evidence its determination will be sustained. [Citations.]" (*Miller* v. *Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624 [166 Cal.Rptr. 826, 614 P.2d 258].)

On appeal, appellant claims prejudice in that "[t]he legislative and executive branches relied upon [PERS's] delay and acquiescence in SB 1107 to the State's detriment of a 'worst case' $1 billion employer contribution claim, which, if transferred to PERF in the 1995-96 fiscal year, could 'pull the trigger' and require across-the-board cuts in other State programs" pursuant to a "trigger bill" known as the Budget Adjustment Law. (Stats. 1994, ch. 135.) However, no citation to the record is provided to show this factual matter was ever raised in the trial court with respect to the laches issue. Nor does appellant's reply brief dispute the assertion in PERS's brief on appeal that the only prejudice cited by appellant in the trial court was "having to defend this litigation." A party cannot change its factual theory on appeal. (*Richmond* v. *Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874 [242 Cal.Rptr. 184].)

We conclude appellant has failed to show any grounds for reversal of the judgment based on laches.

IV. *The Contract Clause*

Appellant contends the trial court erred in determining that Senate Bill No. 1107 and Senate Bill No. 240 are unconstitutional impairments of contract. We disagree.

A. *Standard of Review*

Appellant asserts the standard of review is de novo. We disagree with appellant's apparent belief that a de novo standard of review applies to all issues in this case.

We review questions of law de novo. (*County of Yolo* v. *Los Rios Community College Dist.* (1992) 5 Cal.App.4th 1242, 1248 [7 Cal.Rptr.2d 647].) However, this appeal also challenges factual findings of the trial court. Generally, the trial court's findings will not be disturbed if substantial evidence supports the judgment. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) Under the conflicting evidence rule, we resolve all conflicts in favor of the judgment. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, p. 289.) This standard applies regardless of whether the trial court's decision is based on oral testimony or declarations. (*Shamblin* v. *Brattain* (1988) 44 Cal.3d 474, 479 [243 Cal.Rptr. 902, 749 P.2d 339].)

Appellant urges a different standard here. He claims that even if factual matters are at issue, they present mixed questions of law and fact which require de novo review, particularly in constitutional cases. He cites inter alia *People* v. *Louis* (1986) 42 Cal.3d 969, 984-988 [232 Cal.Rptr. 110, 728 P.2d 180], which involved the question of a prosecutor's "due diligence" to secure the presence of a witness at trial. In extensive dictum, the Supreme Court "suggested (but did not decide) that an appellate court should independently review the record" on due diligence. (*People* v. *Hovey* (1988) 44 Cal.3d 543, 563 [244 Cal.Rptr. 121, 749 P.2d 776] [due diligence finding would be upheld under either standard].)

■ As explained in *Louis*, mixed questions are those " 'in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant legal] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.' " (*People* v. *Louis, supra,* 42 Cal.3d at p. 984, quoting *Pullman-Standard* v. *Swint* (1982) 456 U.S. 273, 289, fn. 19 [102 S.Ct. 1781, 1790-1791, 72 L.Ed.2d 66] [in title VII civil rights case, discriminatory intent is a factual matter, not a mixed question of law and fact of the kind that in some cases may allow an appellate court to review the facts].)

With mixed questions of law and fact, the first step is to establish what, if any, basic, primary, or historical facts are in dispute (abuse of discretion standard). (*People* v. *Louis, supra,* 42 Cal.3d at p. 985.) The second step is to identify the applicable rule of law (de novo standard). (*Ibid.*) The third step—application of law to fact—is the most troublesome. (*Ibid.*) If application of the rule of law to the facts requires an inquiry that is essentially factual—one that is founded on the application of the factfinding tribunal's experience with the mainsprings of human conduct—the concerns of judicial administration will favor the trial court, and the substantial evidence standard will apply. (*Id.* at p. 987.) If, on the other hand, the question requires that the court consider legal concepts in the mix of fact and law and exercise judgment about the values that animate legal principles, the de novo standard will apply. (*Ibid.*; see *McGhan Medical Corp.* v. *Superior Court* (1992) 11 Cal.App.4th 804, 808-811 [14 Cal.Rptr.2d 264] [trial court's denial of petition for coordination of breast implant actions was subject to de novo review because inter alia decision required exercise of judgment about values underlying legal principles].) *Louis* cited United States Supreme Court authority that when mixed questions implicate constitutional rights, the application of law to fact will usually require that the court look to the well defined body of law concerning the relevant constitutional provision. (*People* v. *Louis, supra,* 42 Cal.3d at p. 987, citing *Ker* v. *California* (1963) 374 U.S. 23 [83 S.Ct. 1623, 10 L.Ed.2d 726] [mixed question of probable

cause for search and seizure was treated as question of law and reviewed de novo].)

Despite *Louis*'s dictum our Supreme Court has indicated it is proper to defer to the trial court's finding of historical facts, even where constitutional issues are involved. Our Supreme Court has explained how the standard of review operates in the context of search and seizure cases, which involve the adjudication of a citizen's constitutional rights under the Fourth Amendment. Thus, *People* v. *Leyba* (1981) 29 Cal.3d 591, 596-598 [174 Cal.Rptr. 867, 629 P.2d 961], said the first issue to be decided—whether the police officer subjectively entertained a suspicion that there was criminal activity afoot and the person he or she intended to stop was involved—is a question of fact reviewable under the substantial evidence test. This issue involves factual matters as to what the officer actually perceived, or knew, or believed, and what action he or she took in response. (*Id.* at p. 596.) The second issue—whether it was objectively reasonable for the officer to entertain that suspicion—is a question of law implicating the constitutional standard of reasonableness, which appellate courts have the ultimate responsibility to administer. (*Id.* at p. 598.) Thus, under *Leyba*, "We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People* v. *Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729].)

Our Supreme Court has also discussed the standard of review in a civil case involving constitutional claims. Thus, *Ghirardo* v. *Antonioli* (1994) 8 Cal.4th 791 [35 Cal.Rptr.2d 418, 883 P.2d 960], dealt with the question whether a transaction violated the constitutional prohibition against usury. The Supreme Court said the "trial court's determination of the historical basis of the transactions—in common parlance, what happened—raises a question of fact," but "[o]nce the historical facts of the transaction are determined, the question of whether *that type of transaction* is subject to the usury proscription is a question of law." (*Id.* at pp. 801, 800, original italics.)

 The issues in this case are whether vested contractual rights exist, whether such rights are impaired, and whether the impairment is nevertheless constitutional either because the impairment is not substantial or because a necessity defense applies. The ultimate questions of whether vested contractual rights exist and whether impairments are unconstitutional present questions of law subject to independent review. The question whether there is an impairment is a mixed question of fact and law. However, this does not mean we apply de novo review to all factual findings underlying the

question whether an impairment exists. For example, a major point of contention on appeal is whether the retirement fund remains actuarially sound under Senate Bill No. 1107 and Senate Bill No. 240. Appellant would apparently have us reweigh the evidence of actuarial soundness as a mixed question of fact and law. However, the question of actuarial soundness concerns only the establishment of historical facts and is therefore subject to substantial evidence review. Factual issues to which we apply substantial evidence review shall appear in the discussion that follows. Where appropriate, we shall indicate where our review is de novo.

### B. *Unconstitutional Impairment of Contract*

Appellant contends the trial court erred in determining that Senate Bill No. 1107 and Senate Bill No. 240 are unconstitutional impairments of contract. We disagree.

In resolving this appeal, we have in mind the following general principles:

■ A court must not annul, as contrary to the Constitution, a statute passed by the Legislature, unless it can be said of the statute that it positively and certainly is opposed to the Constitution. (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 692 [97 Cal.Rptr. 1, 488 P.2d 161].)

■ The contract clauses of the federal and state Constitutions limit the power of a state to modify its own contracts with other parties, as well as contracts between other parties. (*Allen* v. *Board of Administration* (1983) 34 Cal.3d 114, 119 [192 Cal.Rptr. 762, 665 P.2d 534]; *Valdes* v. *Cory* (1983) 139 Cal.App.3d 773, 783 [189 Cal.Rptr. 212].) "The state occupies a unique position in the field of contract law because it is a sovereign power. This gives rise to general principles which may limit whether an impairment has [occurred] as a matter of constitutional law. First, '[a]n attempt must be made "to reconcile the strictures of the Contract Clause with the 'essential attributes of sovereign power,' . . ." ' [Citation.] 'Not every change in a retirement law constitutes an impairment of the obligations of contracts, however. [Citation.] Nor does every impairment run afoul of the contract clause.' [Citation.] ' "The constitutional prohibition against contract impairment does not exact a rigidly literal fulfillment; rather, it demands that contracts be enforced according to their 'just and reasonable purport;' not only is the existing law read into contracts in order to fix their obligations, but the reservation of the essential attributes of continuing governmental power is also read into contracts as a postulate of the legal order. [Citations.] The contract clause and the principle of continuing governmental power are construed in harmony; although not permitting a construction which permits contract repudiation or destruction, the impairment provision does not prevent laws which restrict a party to the gains 'reasonably to be expected from

the contract.' [Citation.]" ' " (*California Teachers Assn.* v. *Cory* (1984) 155 Cal.App.3d 494, 510-511 [202 Cal.Rptr. 611] [state's reduction of contributions to teachers' retirement system was unconstitutional impairment of contract].)

"Our analysis requires a two-step inquiry into: (1) the nature and extent of any contractual obligation . . . and (2) the scope of the Legislature's power to modify any such obligation." (*Valdes* v. *Cory, supra,* 139 Cal.App.3d at p. 785.)

As will appear, not all impairments of contract are unconstitutional. We shall first explain why Senate Bill No. 1107 and Senate Bill No. 240 constitute "impairments of contract." We shall then determine the impairments are not constitutionally permissible.

 1. *Senate Bill No. 1107 and Senate Bill No. 240 Constitute Impairments of Contract*

Appellant contends Senate Bill No. 1107 and Senate Bill No. 240 do not "impair a contract" within the meaning of the constitutional provisions. We disagree.

 a. *State Employees Have a Contractual Right to an Actuarially Sound Retirement System*

An initial question raised by this case is whether state employees have a contractual right to an actuarially sound retirement system. We shall conclude that they do.

Appellant cites our decision in *Walsh* v. *Board of Administration* (1992) 4 Cal.App.4th 682 [6 Cal.Rptr.2d 118], for the proposition that it is presumed a statutory scheme is not intended to create constitutionally protected contract rights. (*Id.* at p. 697.) However, we also said in *Walsh* that under California law there is a strong preference for construing governmental pension laws as creating contractual rights for the payment of benefits, and when feasible to do so such laws should be construed as guaranteeing full payment to those entitled to its benefits "with the provision of adequate funds for that purpose." (*Id.* at p. 698 [rejecting contract claim under specialized Legislators' Retirement Law].)

In *Valdes* v. *Cory, supra,* 139 Cal.App.3d 773, 777, we held constitutionally invalid certain 1982 legislative amendments affecting the method of PERS funding under PERL. One provision prohibited payment of previously appropriated state-employer contributions from the state General Fund to the

PERS fund for three months of 1982 and reverted the amounts to the unappropriated surplus of the General Fund. (*Id.* at p. 778.) Another provision ceased school-employer contributions for the same months and provided a mechanism for their reversion to the unappropriated surplus of the General Fund. (*Ibid.*) The legislation also required the PERS Board to transfer an amount equal to that which would otherwise be paid by state and school employers as their three-month contributions to PERS, from the "reserve against deficiencies" portion of the PERS fund to its unallocated portion. (*Ibid.*) The legislation further mandated a retroactive reduction of previously appropriated employer contributions by some school employers for the entire 1981-1982 fiscal year and directed the PERS Board to make commensurate adjustments or refunds from its reserve against deficiencies. (*Id.* at pp. 778-779.)

Concluding the challenged statutes constituted unconstitutional impairments of contract, we issued a peremptory writ of mandate directing the government officials to perform their legal and ministerial duties without regard to the challenged statutes. (*Valdes* v. *Cory, supra,* 139 Cal.App.3d at p. 793.) We held the state, and other public employers, were contractually bound in a constitutional sense to pay the withheld appropriations to the PERS fund, since explicit language in the retirement law constituted a contractual obligation on the part of the state as employer to abide by its "continuing obligation" to make the statutorily set payment of monthly contributions unless and until such time as the PERS Board or the Legislature (after consideration of actuarial recommendations by the PERS Board) deemed such contributions inappropriate. (*Valdes* v. *Cory, supra,* 139 Cal.App.3d at pp. 787, 783-789; see § 20830; former § 20757, enacted by Stats. 1945, ch. 123, § 1, p. 594, and derived from Stats. 1933, ch. 473, § 24, p. 1245 [state's employer contributions "continue to be obligations of the State"].)

In *Valdes* we said " 'a vested contractual right to pension benefits accrues upon acceptance of employment. Such a pension right may not be destroyed, once vested, without impairing a contractual obligation of the employing public entity.' [Citations.] . . .

"Under settled California law, '[t]he employee does not obtain, prior to retirement, any absolute right to fixed or specific benefits, but only to a "substantial or reasonable pension." ' [Citations.] ' "An employee's vested contractual pension rights may be modified prior to retirement for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system. [Citation.] Such modifications must be reasonable, and it is for the courts to determine upon the facts of each case what constitutes a permissible change. To be sustained as reasonable, alterations of employees' pension

rights must bear some material relation to the theory of a pension system and its successful operation, *and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages." ' "* (*Valdes* v. *Cory, supra,* 139 Cal.App.3d at pp. 783-784, original italics, quoting *Betts* v. *Board of Administration* (1978) 21 Cal.3d 859 [148 Cal.Rptr. 158, 582 P.2d 614].)

Thus, the PERS statutes set up a retirement system to pay pension rights of state employees. Actuarial soundness of the system is necessarily implied in the total contractual commitment, because a contrary conclusion would lead to express impairment of employees' pension rights.

In *Valdes* v. *Cory, supra,* 139 Cal.App.3d 773, we said in dictum that, although the PERS statutes contained no explicit legislative commitment to an actuarially sound system, our "review of the present law, its statutory antecedents and the legislative history dispel any doubt that the Legislature intended to create and maintain the PERS on a sound actuarial basis . . . ." (139 Cal.App.3d at pp. 785-786.) We cited former section 20750.9 (now section 20814),[19] calling for periodic adjustment of employer contribution rates in accordance with actuarial valuations. A 1979 amendment to that provision required PERS to change the basis for calculating actuarial equivalents on a regular basis to agree with the interest rate and mortality tables then in effect, for the purpose of ensuring that the actuarial equivalents "are fair, equitable and have a direct relationship to current data." (Assem. Com. on Public Employees and Retirement, Analysis of Assem. Bill No. 260 (1979-1980 Reg. Sess.) Feb. 9, 1979, p. 1, Stats. 1979, ch. 240, § 3, p. 498.) The Legislative Analyst stated the prior use of outdated actuarial assumptions "cause[d] inaccurate reporting of the unfunded liability of the system . . . ." (Legislative Analyst, Analysis of Assem. Bill No. 260 (1979-1980 Reg. Sess.), Mar. 9, 1979, p. 1.) Thus, the concern with actuarial soundness was at least implicit in the statutory scheme.

---

[19]Section 20814 now provides: "(a) Notwithstanding any other provision of law, the state's contribution as fixed under this chapter shall be adjusted thereafter from time to time in the annual Budget Act according to the following method. As part of the proposed budget submitted pursuant to Section 12 of Article IV of the California Constitution, the Governor shall include the contribution rates submitted *by the actuary* of the liability for benefits on account of employees of the state. The Legislature shall adopt the actuary's contribution rates and authorize the appropriation in the Budget Act. [¶] (b) The employer contribution rates for all other public employers under this system shall be determined on an annual basis by the actuary and shall be effective on the July 1 following notice of change in rate." (Stats. 1995, ch. 379, § 2, italics added.)

At the time Senate Bill No. 1107 and Senate Bill No. 240 were enacted, the applicable provision was former section 20750.905, which provided in part that "the Governor shall include the contribution rates submitted *by the actuary* of the liability for benefits on account of employees of the state. The Legislature shall adopt the actuary's contribution rates and authorize the appropriation in the Budget Act." (Stats. 1991, ch. 83, § 31 [enacting Assembly Bill No. 702, 1991-1992 Regular Session], italics added.)

Moreover, in amending other PERS provisions in 1982, the Legislature acknowledged the need for actuarial integrity. Thus, Statutes 1982, chapter 1496, section 1, page 5796, provides in part: "It is the intent of the Legislature in enacting this act to preserve the actuarial integrity of the Public Employees' Retirement System . . . ."

We also said in *Valdes* v. *Cory, supra,* 139 Cal.App.3d 773, that "[a]uthority is not lacking . . . for the proposition that employee pension beneficiaries have a vested interest in the integrity and security of the source of funding for the payment of benefits. [Citations.]"[20] We cited cases from other jurisdictions, including *Sgaglione* v. *Levitt* (1975) 37 N.Y.2d 507 [375 N.Y.S.2d 79, 337 N.E.2d 592, 594-595], which in the course of invalidating a New York statute that would have mandated the state comptroller to invest retirement funds in certain bonds, indicated that "protection of the sources of funds" for retirement or pension benefits is necessarily implied in the constitutional protection of the underlying contract providing for benefits. (*Id.* at pp. 511-512 [337 N.E.2d at p. 594].) The *Sgaglione* court also indicated the purpose of the reserve funds was "to protect future taxpayers against burdens engendered by past generations of taxpayers in providing for retirement benefits of former public employees." (*Id.* at p. 514 [337 N.E.2d at p. 596].) Thus, the purpose of the reserve fund was twofold: "to protect the receivers of benefits and to protect future taxpayers by use of actuarially sound retirement funds." (*Id.* at pp. 511-512, 514 [337 N.E.2d at pp. 594, 596.)

In *Valdes* v. *Cory, supra,* 139 Cal.App.3d at page 785, we also cited the Washington, State case of *Weaver* v. *Evans* (1972) 80 Wn.2d 461 [495 P.2d 639], which held the legislature, by giving the governor allotment control and by enacting the budget act, did not intend to confer upon the governor the power to modify the legislative provision of systematic funding to attain and maintain a legislatively promised financially sound teachers' retirement system. The *Weaver* court said ". . . where, as here, the legislature has over a span of years indicated a deep concern with the actuarial soundness of the retirement system, and that concern has culminated in the express adoption of a systematic method of funding to ultimately attain the desired soundness, then the principle of systematic funding so adopted becomes one of the vested contractual pension rights flowing to members of the system." (*Weaver* v. *Evans, supra,* 495 P.2d at p. 649.)

Subsequent cases of this court have touched on the concept of actuarial soundness. Thus, in *California Teachers Assn.* v. *Cory, supra,* 155 Cal.App.3d

---

[20]Elsewhere in his brief appellant argues *Valdes* is distinguishable because it involved security of PERS reserves and here there is no attempted usage of reserves. Nevertheless, the general principles expressed in *Valdes* have equal application here.

494, we recognized the " 'interest of the employee . . . in the security and integrity of the funds available to pay future benefits.' [Citation.]"[21] (*Id.* at p. 506, citing *Valdes* v. *Cory, supra,* 139 Cal.App.3d 773.)

Similarly, in *Claypool* v. *Wilson, supra,* 4 Cal.App.4th 646, we noted the general rule that pension plan members do not have a vested right to control administration of the plan, but "[t]his court implied contractual obligations in *Valdes* v. *Cory* and *California Teachers Assn.* v. *Cory* which constrained the administration of PERS and the Teachers' Retirement Fund. We did so on the strength of assurances to be found in the language of the governing statutes. In both cases the statutes showed a 'commitment to permanency' of funding of 'critical importance' to the 'underlying contractual promise to pay the pensions . . . .' [Citation.] We noted that the implication of suspension of legislative control must be 'unmistakable.' [Citation.]" (*Claypool, supra,* 4 Cal.App.4th at p. 670, citing *California Teachers Assn.* v. *Cory, supra,* 155 Cal.App.3d at pp. 506, 509.)

In *Claypool,* we held the use of funds from former supplemental cost of living adjustment programs to offset employer contributions did not impair funding rights identified in *Valdes.* (*Claypool* v. *Wilson, supra,* 4 Cal.App.4th at pp. 670-673.) However, *Claypool* differed from *Valdes,* because *Claypool* involved the valid repeal of former supplemental cost of living adjustment programs which had created a unique fund of a "critically different nature," in that the moneys were not previously counted toward actuarial soundness of PERS, were not reserved to underwrite the actuarial soundness of basic pension benefits, and were not tied to the provision of any special benefits required to be paid. (*Claypool* v. *Wilson, supra,* 4 Cal.App.4th at p. 671.) Here, however, as in *Valdes,* we deal with actions which do have an effect on actuarial soundness of the PERS fund.

 We therefore conclude that our dictum in *Valdes* was sound and therefore that state employees under PERS have a contractual right to an actuarially sound retirement system.

Appellant concedes "as a matter of public policy the PERF and all [PERS] funds should be maintained on an actuarially sound basis." Appellant nevertheless believes there is no implied vested contractual right to level

[21]In *California Teachers Assn.* v. *Cory, supra,* 155 Cal.App.3d 494, we issued a peremptory writ of mandate directing the controller to transfer to the teachers' retirement fund the full amounts required by the Education Code, without limitation by the provisions of relevant budget acts. We determined the state's failure to pay in accordance with statutory terms constituted an unconstitutional impairment of contract. (*Id.* at pp. 510-512.) Here, appellant notes *California Teachers Assn.* is distinguishable because that case concerned statutes which contained a "straight-out promise to pay fixed and determinable sums of money." (*Id.* at p. 508.) Nevertheless, the general principles apply equally here.

contribution payments (as opposed to "in arrears" financing), because before Senate Bill No. 1107 and Senate Bill No. 240 the Legislature tinkered with the system without litigation being filed. According to appellant, there can be no vested contract right because the timing of state contributions has been "in a state of transition since 1990," i.e., the 1990 change from monthly to quarterly contributions, and the 1991 change from quarterly to semiannually. Appellant asks: "If a [PERS] member was first employed or retired in 1991, 1992, 1993, 1994, or 1995, what is the supposed 'vested right' to which payment schedule?"

However, we have seen there is a vested right to "integrity and security of the source of funding for the payment of benefits." (*Valdes* v. *Cory*, *supra*, 139 Cal.App.3d at p. 785.)

Here, the prior unchallenged changes did not alter the vested right to integrity and security of the source of funding for the payment of benefits. Thus, the change from monthly to quarterly contributions was approved by the board and accompanied by a comparable new advantage. The change from quarterly to semiannually was of temporary duration with express findings that soundness of the retirement fund would not be affected and with express provision for mitigation through increased employer contributions. Thus, the legislative events since 1990 do not defeat a finding of vested contractual rights.

Appellant asserts the PERS benefit handbook tells members there is a potential for statutory changes as follows: "While reading this material, remember that we are governed by the Public Employees Retirement Law. The statements in this booklet are general. The retirement law is complex and subject to changes. If there is a conflict between the law and this booklet, any decisions will be based upon the law and not this booklet." Appellant cites *City of Torrance* v. *Workers' Comp. Appeals Bd.* (1982) 32 Cal.3d 371, 379 [185 Cal.Rptr. 645, 659 P.2d 1162], which said laws enacted subsequent to execution of an agreement are not ordinarily deemed to become part of the agreement unless its language clearly indicates this to have been the intention of the parties.

However, appellant fails to provide a record citation for the handbook quote, in violation of California Rules of Court, rule 15(a), which requires that the "statement of any matter in the record shall be supported by appropriate reference to the record." Moreover, assuming the handbook contains the caveat that the law is subject to change, there has been no change in the law that modifications to vested pension rights must bear a material relation to the theory of a pension system and its successful

operation, and changes which result in disadvantage to employees must be accompanied by comparable new advantages. (*Claypool* v. *Wilson*, *supra*, 4 Cal.App.4th at p. 665.)

We conclude state employees under PERS have a contractual right to an actuarially sound retirement system.

### b. *Vested Contractual Rights Are Impaired*

 Appellant contends no actuarially based vested rights are impaired. We disagree.

As indicated, " '[a]n employee's vested contractual pension rights may be modified prior to retirement for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system. [Citations.] Such modifications must be reasonable, and it is for the courts to determine upon the facts of each case what constitutes a permissible change. To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation . . . .' " (*Betts* v. *Board of Administration*, *supra*, 21 Cal.3d at pp. 864-865.) The material relation requirement fulfills the purpose of "keeping the pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system . . . ." (*Wallace* v. *City of Fresno* (1954) 42 Cal.2d 180, 184 [265 P.2d 884].)

"The ['material relation'] justification must relate to considerations internal to the pension system, e.g., its preservation or protection or the advancement of the ability of the employer to meet its pension obligations. Changes made to effect economies and save the employer money do 'bear some material relation to the theory of a pension system and its successful operation . . . .' [Citation.] That is not to say that a purpose to save the employer money is a sufficient justification for change. The change must be otherwise lawful and must provide comparable advantages to the employees whose contract rights are modified. . . . [T]he monetary objective will not invalidate a modification which is otherwise valid." (*Claypool* v. *Wilson*, *supra*, 4 Cal.App.4th at p. 666 [legislative changes produced comparable new advantages].)

We said in *Valdes*: "Had the Legislature actually appropriated any of the PERS trust funds for purposes unrelated to the benefit of PERS members, e.g., to balance the state budget and avoid a year-end deficit, we would have no difficulty concluding that such legislative action modified vested rights of

PERS members. [Citations.] When instead the Legislature directs that funds held in trust for the exclusive benefit of the members and beneficiaries of PERS be used to satisfy the state's contractual obligations to make monthly contributions to the retirement fund so that monies regularly appropriated for that purpose can irretrievably be redirected to balance the state budget, the effect is precisely the same, i.e., vested rights of PERS members are impaired." (*Valdes* v. *Cory*, *supra*, 139 Cal.App.3d at pp. 788-789.)

Here, it is undisputed that Senate Bill No. 1107 and Senate Bill No. 240 were budget balancing measures. Appellant fails to show any pension reform or pension-related connection whatsoever, and, as we discuss *post*, the legislation afforded no comparable advantage.

Appellant suggests *Claypool* "clarified" that *Valdes* was a narrow decision limited to reserve funding. He cites *Claypool*'s statement that *Valdes* "rests upon 'the nature of the reserve against deficiencies.' [Citation.] That fund is statutorily allocated to meet contingencies that could impair the actuarial soundness of the PERS fund." (*Claypool* v. *Wilson*, *supra*, 4 Cal.App.4th at p. 671.) However, as we have seen, *Claypool* continued to say that the *Claypool* issues were different because they involved the valid repeal of former supplemental cost of living adjustment programs which had created a unique fund of a "critically different nature," in that the moneys were not previously counted toward actuarial soundness of PERS, were not reserved to underwrite the actuarial soundness of basic pension benefits, and were not tied to the provision of any special benefits required to be paid. (*Ibid.*) Here, however, as in *Valdes*, we deal with actions which do have an effect on the actuarial soundness of the PERS fund.

Appellant maintains Senate Bill No. 1107 and Senate Bill No. 240 did not impair any rights but merely deferred contributions, and the state continues to make full payment albeit at a different time. Appellant cites our statement in *Valdes* that in that case the state did not merely defer payment for a brief period but repudiated its obligations, such that suspended contributions appeared to be irretrievably lost. (*Valdes* v. *Cory*, *supra*, 139 Cal.App.3d at p. 791.) However, the deferral in this case was not for a brief period. Neither Senate Bill No. 1107 nor Senate Bill No. 240 contained a sunset provision, and the deferrals were for six or twelve months.

As indicated, appellant does not dispute the need to maintain actuarial soundness but claims the legislation did not render the system actuarially unsound. According to appellant, "the legal question of actuarial soundness, when deemed an implied contract right subject to constitutional protection by the judiciary, must be determined on an objective basis." However, it

appears to us that the question whether a particular fund is actuarially sound presents a factual question reviewable under the substantial evidence standard. This case is thus different from appellant's cited authority, *Huntington Park Club Corp.* v. *County of Los Angeles* (1988) 206 Cal.App.3d 241, 247 [253 Cal.Rptr. 408]. There, the issue was whether the term "percentage game" in the gaming law was unconstitutionally vague. The trial court found, based on expert testimony, that the term "percentage game" had no commonly accepted or technical meaning within the gaming industry; therefore, the trial court held the term was unconstitutionally vague. (*Ibid.*) The appellate court reversed, stating the definition and precision of the statutory term did not turn on the weighing of expert testimony but was an issue of law. (*Ibid.*) Here, the issue is not one of statutory construction but rather the factual question of the effect of deferred contributions on actuarial soundness of a retirement fund under actuarial, not legal, principles. We shall conclude substantial evidence supports the judgment.

PERS Actuary Michael Swiecicki explained in his declaration why Senate Bill No. 1107 and Senate Bill No. 240 rendered the retirement fund actuarially unsound: "[PERS] plans are pre-funded. Instead of allocating money at or near the time that benefits become due, a pre-funded plan relies upon an orderly schedule of contributions well in advance of benefit requirements. . . . The willingness and ability of the sponsor of a defined benefit pension plan to maintain this 'orderly schedule' is the major factor in the assurance of benefit security for retirees and in the maintenance of intergenerational taxpayer equity. . . .

". . . In the determination of the value of the employer contribution, it is necessary to make an assumption as to when the contribution will be made. This is because investment earnings are assumed to begin accruing when the contribution is made. When contributions are delayed beyond the date assumed, the plan falls out of actuarial balance and actuarial soundness is endangered.

". . . The funding method used by [PERS] is a modified entry-age-normal cost method. Under this method, the employer cost is calculated in two distinct pieces: the plan normal cost and the unfunded liability cost. Each of these two pieces is determined as a level percentage of payroll expected to continue as such until a future point in time. The employer contribution rate is the sum of the two and is likewise expressed as a percentage of payroll.

". . . A normal cost is determined for each member as the level percentage of pay which is expected to accumulate, together with the member's contributions, to an amount sufficient to completely fund that member's benefits at his or her retirement date had funding been initiated at his or her

entry into the plan. The plan normal cost is the weighted (by salary) average of all the individual normal costs.

". . . The accumulation of plan normal costs is called the plan's accrued actuarial liability. When the accrued actuarial liability exceeds the plan assets, an unfunded accrued actuarial liability exists. For the plans for the State employees, this liability is funded as a level percentage of payroll through to June 30, 2029.

". . . Underpinning both the normal cost calculation and the amortization of the unfunded accrued actuarial liability is an explicit assumption concerning the timing of contributions. The importance of timing stems from the fact that a large portion of a member's benefit is funded by the investment earnings which are generated by plan contributions. When monies are contributed later than expected, reduced earnings result—thus creating a shortfall. This impairs benefit security and causes a portion of the total current employment cost of plan members to be shifted into the future. This shift of costs can accurately be characterized as a loan to cover the current employee costs—a loan that must be repaid by future generations of taxpayers." (Italics omitted.)

PERS also submitted the declaration of Richard Roeder, an outside actuary who previously served as a consulting actuary to PERS. He said: "The most important general financial objective for any public employee retirement system is to practice intergenerational equity, which means calculating and receiving during each fiscal year contributions which, expressed as percents of active member payroll, will remain approximately level from the present generation of citizens to future generations of citizens. This level contribution system ensures that the benefit promises made to employees for services rendered will be paid as promised in the future when the employees retire." "With level contributions today's taxpayers pay for the retirement costs of today's employees, at the time the benefits of those employees' services are being received."

In *Valdes* we said in dictum: "The current [as of 1983] provisions of the retirement law contain no explicit legislative commitment to an actuarially sound system. However, our review of the present law, its statutory antecedents and the legislative history dispel any doubt that the Legislature intended to create and maintain the PERS on a sound actuarial basis [citations]." (*Valdes* v. *Cory, supra,* 139 Cal.App.3d at pp. 785-786, fn. omitted [finding record inadequate to determine whether disputed provisions in fact impaired actuarial soundness of PERS].) "If for some lawful reason the existing PERS funds are demonstrably sufficient for actuarial soundness without the state's

periodic contribution, the Legislature may forego the contribution without violating the holding in *Valdes* v. *Corey*." (*Claypool* v. *Wilson*, *supra*, 4 Cal.App.4th at p. 671.)

Appellant appears to believe *Claypool* establishes a test that looks only at current financial status by asking whether existing funds are demonstrably sufficient. We disagree. Thus, *Claypool* continued on to say funds in a reserve account dedicated to "backstopping" the integrity of the system against unexpected contingencies would not be able to be used to offset the employers' obligations to contribute to the actuarial soundness of the system unless there was a predicate showing that their use would not undermine the financial integrity of the system. (*Claypool* v. *Wilson*, *supra*, 4 Cal.App.4th at p. 672.) Since the funds at issue in *Claypool* were not allocated to backstop the integrity of the system and were not counted toward the maintenance of actuarial soundness of the PERS fund or allocated to cover contingencies that could impair actuarial soundness, we concluded those funds were immaterial to actuarial soundness. (*Id.* at p. 673.) Obviously, the same cannot be said in this case.

Appellant contends it is undisputed the PERS fund remains actuarially sound despite Senate Bill No. 1107 and Senate Bill No. 240. However, while PERS experts acknowledged the fund remains "solvent (meaning it still has the ability to meet its monthly benefit payroll)," they did not agree the fund remains actuarially sound. Thus, PERS submitted a supplemental declaration from actuarial expert Richard Roeder, who attested: "[T]he fact that [PERS] can *presently* meet its cash obligations is not the test that must be made by an actuary in evaluating the actuarial effects of SB 1107 and SB 240. As I stated [in a prior declaration], 'Shifting from a payment schedule where the employer contributions are made the same fiscal year the liabilities are incurred to "in arrears" financing, where contributions are paid one or two fiscal years after the liability is incurred, results in a tangible loss to [PERS] members which is a permanent loss unless SB 240 and SB 1107 are negated. . . .' Thus to determine the actuarial soundness of changes in the contribution pattern a *public* pension system requires the actuary to look to the long term *future* effects of those changes. . . . [I]t is clear that SB 1107 and SB 240 have 'significant detrimental effects on the financial future of [PERS], because greater contributions would be required from future taxpayers." (Original italics.)

The evidence submitted by PERS provides substantial evidence supporting the judgment.

Appellant argues expert testimony is circumstantial, and an appellate court may reject a trial court's conclusion resulting from expert witness opinion

and rely instead on other expert witnesses or direct evidence. Appellant cites *In re Alcala* (1990) 222 Cal.App.3d 345, 373-374 [271 Cal.Rptr. 674]. In that case, however, the record showed the trial court applied the wrong standard to a prison warden's opinion on matters of prison security. (*Id.* at pp. 372-373.) No such problem appears in this case. Appellant also cites *Johnathan* v. *Shea* (1971) 19 Cal.App.3d 328 [96 Cal.Rptr. 673], where the appellate court rejected the trial court's reliance on expert witness testimony construing church canons, where the expert's opinion conflicted with the express language of the canons. (*Id.* at pp. 334-335.) There, however, the appellate court was applying the principle that extrinsic evidence is inadmissible where the written document is unambiguous. (*Ibid.*) No such issue is present in this case. Appellant also cites cases upholding judgments against claims that the trial court or jury was required to accept or reject expert evidence. These cases do not assist plaintiff here, where plaintiff seeks to reverse a judgment. We also disagree with appellant's assertion that PERS "by its experts' testimonial definitions regarding the 'level contribution' system would take the judiciary directly into constitutionalizing debatable public policy viewpoints regarding intergenerational tax equity and hypothetical future fiscal costs to the State." It appears to us that the experts properly gave evidence on actuarial matters.

Appellant argues PERS's experts improperly focused on a hypothetical future, in contravention of the principle that the court need not decide how the contract clause might apply to hypothesized facts. (E.g., *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 239-242 [149 Cal.Rptr. 239, 583 P.2d 1281].)

We disagree that this case is premised on hypotheticals. Thus, Swiecicki measured shortfall under two methods—(1) assuming future employer contributions would not be increased to compensate for the "in arrears" contributions, and (2) assuming they would be increased.[22]

Under the first method, Swiecicki attested with respect to Senate Bill No. 240: "For the 1992-93 fiscal year, $444 million was paid on July 1, 1994, or sixteen and one-half months late. Sixteen and one-half months at the assumed actuarial interest rate of 8.75% is $54 million (approximately). Thus on July 1, 1994, the fund was short (out of actuarial balance) by $54 million solely due to the delay in the payment of 1992-93 requirements. Also, as of July 1, 1994, the 1993-94 general fund contribution requirement had not

---

[22]As we indicate in our discussion of mitigation, *post*, in 1994 PERS tried to recapture some of the losses by adopting a five-year employer contribution rate increase. However, the increase was not appropriated, assertedly because the increase should have been amortized over the 40-year amortization period.

been paid. This is approximately $467 million. As of July 1, 1994, this payment was (on the average) four and one-half months late. Interest on this amount for the period is approximately $15 million. Combined with the interest from the 1992-93 delay in the amount of $54 million there is a total shortfall as of July 1, 1994 of $536 million (467 + 15 + 54). If the shortfall were measured on June 30, 1994 it would have been $980 million (536 + 444 which was paid on July 1, 1994). . . ." Swiecicki also calculated future years through fiscal year 2011-2012.

Under the second method, Swiecicki calculated an adjusted shortfall for fiscal years 1992-1993 through 2011-2012. Since Swiecicki prepared his declaration in September 1994, the shortfall for the first few fiscal years was the same as method one since there had been no increase in contribution rates for those years. Beginning with fiscal year 1995-1996, the shortfall was $709 million (compared to $722 million under method one). The adjusted shortfall under method two was equal to the shortfall from method (1) less the accumulated value of increased contributions.

Swiecicki's original declaration addressed only Senate Bill No. 240, because Senate Bill No. 1107 was never implemented. In a supplemental declaration, Swiecicki did the calculations under Senate Bill No. 1107 and determined there would also be shortfalls under that enactment. The shortfall was $236 million for fiscal year 1992-1993, $274 million for fiscal year 1993-1994, and so on through fiscal year 2012-2013.

Swiecicki concluded: "Any delay in the payment of the employer contribution will result in a combination of a permanent shortfall in plan assets together with an increased annual contribution requirement. Delaying the payments for currently emerging liabilities places the responsibility of those liabilities onto a future generation of taxpayers. . . ." (Italics omitted.)

Thus, PERS's experts did not rely only on a hypothetical future, though the PERS experts also provided a 20-year projection of shortfall amounts. Moreover, the calculations for future years are not speculative. The future is an inherent consideration in actuarial computations. The state's contributions " 'represent the employer's ongoing share of the actuarial equivalent of amounts necessary to fund current and future benefits due covered employees . . . .' " (*Valdes* v. *Cory, supra,* 139 Cal.App.3d at p. 786.) "[W]here the state makes a contractual offer of a reserve funding scheme for a pension plan the consideration being tendered is a measure of fiscal insurance against future adverse economic and political developments. The [public employee] who accepts this inducement at the outset of a career . . . gains nothing if the state has a retained power to periodically modify the agreement. There is

no correspondence between the annual installments and each year's further employee service. If the annual installments are disrupted the annual liabilities of the plan will invade the corpus of earlier reserve funding allotments long before they are of any use to the [public employee] whose right does not mature for decades." (*California Teachers Assn.* v. *Cory, supra,* 155 Cal.App.3d at pp. 509-510, fn. omitted.)

Appellant argues the shortfall was based on status quo actuarial timing assumptions, and any shortfall is hypothetical because it could be eliminated by the PERS Board amending its actuarial timing assumptions. However, the PERS actuaries explained the importance of timing in the calculation. Moreover, the Legislature failed to obtain actuarial input from the PERS Board prior to enactment of Senate Bill No. 1107 or Senate Bill No. 240, leaving appellant in a poor position with respect to defending actuarial soundness of the legislation.

Appellant argues the PERS experts employed the wrong test for actuarial soundness by placing emphasis upon equity concepts deemed to be the core of the level contribution system. According to appellant, this was the wrong test for three reasons: (1) the constitutionality of a statute, including definitions necessary to that determination, is a question of law, which does not turn on expert testimony; (2) the contract clause does not apply to hypothetical facts; and (3) the power of the purse belongs to the lawmakers. None of these points establishes any defect in the PERS experts' actuarial analysis.

In his reply brief, appellant makes detailed attacks on PERS's evidence, which appellant did not make in his opening brief. It is not proper for an appellant to raise new points in a reply brief, to which the respondent has no opportunity to respond. (*Neighbours* v. *Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788] [points raised for first time in reply brief will not be considered unless good cause is shown for failure to present them in opening brief].)

We conclude Senate Bill No. 1107 and Senate Bill No. 240 impair vested contractual rights.

c. *There Was No Comparable New Advantage*

██ Appellant argues the trial court erred in ruling that Senate Bill No. 1107 and Senate Bill No. 240 were defective in their failure to provide comparable new advantages in exchange for the adverse effect of in-arrears financing. We disagree.

" 'To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, *and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages.*

[Citations.]' " (*Betts* v. *Board of Administration, supra,* 21 Cal.3d at p. 864, original italics.) "The saving of public employer money is not an illicit purpose if changes in the pension program are accompanied by comparable new advantages to the employee. If that were not the case the reasonable modification doctrine would add little flexibility to the administration of the public pension systems. The 'material relation' requirement fulfills 'the purpose of keeping the pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system . . . .' [Citation.]" (*Claypool* v. *Wilson, supra,* 4 Cal.App.4th at pp. 665-666.)

Appellant does not assert any comparable new advantage exists but instead argues a comparable new advantage is required only in cases of modification of a pension *benefit,* because cases cited by PERS in the trial court involved modifications of pension benefits. We disagree. Although certain cases happened to involve modification of benefits, the controlling principle applies to modification of any "vested contractual pension right." (See *Valdes* v. *Cory, supra,* 139 Cal.App.3d at p. 784.) *Valdes* itself did not involve a modification of benefits but rather a modification in the payment of employer contributions to the fund.

Under the subheading in his brief concerning comparable advantage, appellant cites *San Francisco Taxpayers Assn.* v. *Board of Supervisors* (1992) 2 Cal.4th 571, 582 [7 Cal.Rptr.2d 245, 828 P.2d 147], for the proposition that a distinction exists between statutes specifically enacted for the purpose of repudiating particular contract duties and statutes imposing budgetary restrictions. The *San Francisco Taxpayers* case involved the constitutional governmental spending limits of California Constitution, article XIII B (hereafter, article XIII B). A taxpayers' association sought to compel a city and county to include the city and county's annual appropriation to its employee retirement fund in calculating the appropriations subject to the constitutional spending limitations. The government argued retirement contributions were exempt under the constitutional provision exempting appropriations for "debt service." Applying the principle that a more specific provision controls over a general provision, the Supreme Court held the retirement fund contribution is subject to the spending limits because the Constitution expressly classifies appropriations to "retirement" funds as being "subject to limitation." (*San Francisco Taxpayers Assn.* v. *Board of Supervisors, supra,* 2 Cal.4th at p. 577.)

The *San Francisco Taxpayers* court rejected the board of supervisors' argument that the court's construction would result in a contract clause violation. (*San Francisco Taxpayers Assn.* v. *Board of Supervisors, supra,* 2

Cal.4th at p. 582.) The Supreme Court indicated that cases such as *Valdes* were distinguishable because they dealt with statutes intended to abrogate underlying contractual and statutory duties, as opposed to article XIII B, which merely imposes budgetary restrictions. (2 Cal.4th at pp. 582-583.) The spending limit provision "does not repudiate, or even modify, any contractual right or obligation [but] can more accurately be said to bring retirement obligations under the umbrella of an overall spending limit, [though] even this limited statement is an oversimplification. In fact, other provisions of the law provide substantial protection for retirement obligations, even in the face of budgetary competition. Specifically, the City has mandatory duties to make periodic payments to its retirement funds in amounts sufficient to keep the funds actuarially sound[23] [citations]; and [other constitutional provisions] permit[] the City to recover the cost of such contributions without regard to the constitutional maximum tax rate. [Citation.] [¶] Nor does article XIII B provide a strong incentive for a governmental entity to attempt to avoid its retirement obligations. This is because each year's spending limit reflects the prior year's retirement contributions and other appropriations, adjusted to account for the change in population and the cost of living. [Citations.] Thus, the City's high retirement costs in the base year have been reflected in subsequent years by higher and higher adjusted spending limits. . . . [¶] While it can be argued that any budget entails a theoretical reduction in the security of budgeted obligations, more is required to establish a serious doubt as to a law's validity under the contract clause. Particularly in this area, ' "[t]he Constitution is 'intended to preserve practical and substantial rights, not to maintain theories' . . . ." ' " (*San Francisco Taxpayers Assn.* v. *Board of Supervisors, supra,* 2 Cal.4th pp. at 583-584, fns. omitted.)

The Supreme Court concluded article XIII B does not operate as a substantial impairment. (*San Francisco Taxpayers Assn.* v. *Board of Supervisors, supra,* 2 Cal.4th at p. 584.) "Its effect, rather, has been to require governmental entities to reduce the overall growth in appropriations by reducing expenditures not required by law, except where the voters have chosen to increase the spending limit." (*Ibid.*)

However, of particular interest to the case before us, the Supreme Court continued on to say: "A governmental entity that decided to make discretionary appropriations in other areas rather than legally required contributions to retirement funds might well thereby violate the contract clause [citation], but it would not be acting under the aegis or compulsion of article XIII B." (*San Francisco Taxpayers Assn.* v. *Board of Supervisors, supra,* 2 Cal.4th at p. 584.)

---

[23]As discussed *ante,* we have concluded there is a requirement of actuarial soundness in the PERS retirement laws, with respect to the state.

That distinction applies in this case. Unlike article XIII B, which limits overall spending by the government, Senate Bill No. 1107 and Senate Bill No. 240 alter an existing obligation by deferring payments which would otherwise be required.

We conclude appellant fails to show any trial court error with respect to comparable advantage.

### d. *Mitigation/Recapture*

Appellant suggests there was no impairment because the legislation contemplated that any detriment would be mitigated. Thus, appellant asserts it was the understanding of the Legislature (and the Department of Finance) that any adverse effects of the "in arrears" financing would be offset by increases in future employer contribution rates through the remaining statutory amortization period (to the year 2029).

The trial court found appellant failed to establish mitigation, and "the Court may not properly speculate with regard to potential future mitigating matters." Even assuming a de novo standard of review, we find no basis for reversal of the judgment.

On appeal, appellant acknowledges Senate Bill No. 1107 and Senate Bill No. 240 contained no express provision for mitigation. Appellant appears to argue mitigation was implied by the fact that in *prior* legislation (Assem. Bill No. 702) the Legislature did expressly provide for mitigation of the temporary change from quarterly to semiannual payments, by an increase in employer contributions. However, the fact that the Legislature expressly provided for mitigation in the prior legislation indicates the Legislature knows to expressly provide for mitigation if that is its intent.

Appellant asserts the evidence, including legislative history of Senate Bill No. 1107 and Senate Bill No. 240, reflect that mitigation was "contemplated." Appellant maintains we must apply the principle that construction of a statute by officials charged with its implementation must be given great weight. Appellant also urges that the Legislature's intent is critical.

However, the evidence showed the supposed mitigation was illusory at best, and no mitigation occurred. As to intent, although legislators and legislative staff may have made assumptions about mitigation and may have discussed the matter with PERS staff, there was never any actuarial input by the Board.

Thus, appellant cites the following evidence on the matter of mitigation:

*Young Declaration*: William Young, a state budget analyst, attested: "15. During . . . conversations [with PERS staff], questions regarding potential effects of the proposed SB 1107 were routinely asked of [PERS Assistant Executive Officer] Robert Walton. It was my understanding based on these conversations that any effects of the continuation of semi-annual 'in-arrears' financing of the State general fund employer contributions past the 1991-92 fiscal year would be included in future employer contribution rates and amortized over the life of the statutory amortization period. . . .

"'. . . . . . . . . . . . . . . . . . . . . . . . . .

"18. [Based on discussions about SB 240] it was my understanding that, as with SB 1107, any effects resulting from the change in transfer date would result in higher State employer contribution rates over the life of the amortization period.

"19. During the spring of 1994 I was amazed to learn that the [PERS] Board would file a lawsuit, and then learn that the [PERS] Board had submitted 1994-95 State employer contribution rates which included a 5-year period for 'recapturing losses' resulting from the 'in-arrears' financing of the State general fund employer contribution. This was surprising to me because the understanding had always been, and I had so informed Department of Finance officials, that any 'losses' resulting from 'in-arrears' financing would result in increases in the State general fund employer contribution rate over the life of the statutory amortization period."

*Beavers Declaration*: Legislative analyst Gerald Beavers attested: "At no time during this series of meetings with [PERS] staff regarding SB 1107 did I have any reason to believe that State employer contribution rates would be adjusted on any basis other than over the entire 40-year amortization period as a result of the SB 1107 timing of transfer change to semi-annually 'in arrears.' It was and remains my understanding that this is the standard method of actuarial calculations by which employer contribution rate calculations every year include adjustments and changes over the life of the amortization period."

*Obregon Declaration*: Legislative consultant Sam Obregon attested: "7. In [a] June 24, 1993, memorandum [to various senators] I informed the Senators regarding the basic proposed SB 240 change in the timing of State employer contributions and informed the Senators that 'PERS has estimated that based on current payroll the state employer rates will be "increased about 0.433 percent as a result of the new payment schedule" in SB 240. Based on this rate change estimate, PERS projects additional costs to the state in the amount of $22.8 million yearly beginning in 1996 until 2029.' . . .

"8. My information regarding the additional cost to the State of approximately $22.8 million yearly beginning in 1996 until 2029 came from conversations between myself and Robert Walton, Assistant Executive Officer, [PERS]. It was my understanding throughout the legislative process involving SB 240 that any 'losses' due to 'in-arrears' financing of State general fund employer contributions would result in increased employer contribution rate(s) and would be amortized over the statutory amortization period." (Italics omitted.)

*Turnage Declaration*: Legislative analyst Robert Turnage attested: "10. It was discussed [with PERS representatives] that SB 240 would have an effect on future State employer contribution rates and that the State employer contribution rates would be adjusted over the life of the currently used amortization period to reflect the change in the payment dates.

"11. The Assembly floor analysis for SB 240 was distributed to Assembly members prior to Assembly debate and passage of SB 240. . . . [It] includes the following comments regarding fiscal effect: [¶] '[PERS] will suffer a substantial revenue loss which would normally be derived from investment earnings. PERS will therefore increase the employer contribution rate in future fiscal years to compensate for a loss in revenue.'

"12. The Senate floor analysis for SB 240 was distributed to Senate members prior to Senate debate and passage of SB 240. . . . [It] also includes the statement: [¶] 'PERS indicates that there will be a substantial revenue loss normally derived from the investment earnings, and will therefore increase the state's employer contribution rate in future fiscal years to compensate for the loss.'

"13. A document was distributed to legislative staff by [PERS] staff before Senate floor debate on SB 240. This document . . . specifically stated that: [¶] 'It is important to note that lost investment income resulting from this deferral will become an employer liability. This is because employer accounts receive interest credited at the net earnings rate. Therefore less investment income results in less interest crediting to employer accounts, which would be taken into consideration during the next valuation process. Additionally, the timing of contributions is considered in the actuarial valuation process. Preliminary estimates reflect the State employer's rate for miscellaneous members, both first and second tier, will increase about 0.433 percent as a result of the new payment schedule.'

"14. The potential annual amount of increase in the State employer contribution estimated by [PERS] staff ($22.8 million) was cited by Senator

Hughes as a reason to vote no on SB 240 in the floor debate on the bill (which I listened to on the Legislature's speaker system)."

In response to appellant's evidence, PERS on appeal cites the following evidence:

*Crist Declaration:* The PERS Board President declared: "8. Following passage of SB 240, . . . the Board voted by a vote of 9-1 to adjust the employer contribution rate to the Retirement Fund for a period of five years in an attempt to mitigate some of the direct and immediate financial effects of the skipped employer contributions for the 1992-93 and 1993-94 fiscal years. . . .

". . . . . . . . . . . . . . . . . . . . . . .

"10. On June 3, 1994, the Board transmitted to the Legislature, under my signature, the actuarially determined, Board-approved employer contributions for the 1994-95 fiscal year. . . . These 1994/95 employer contribution rates included an actuarially-determined increase (pursuant to a 5-year amortization schedule), to address some of the costs associated with SB 1107 and SB 240.

"11. Following the Board's transmittal to the Legislature of the Board-approved, actuarially-determined employer contribution rates for the 1994/95 fiscal year on June 3, 1994, I learned from Board staff that the portion of these rates intended to partially offset SB 240 losses had not been included in the Budget Act for fiscal year 1994/95. Even if the Legislature had included the amount representing this adjustment in the Budget Act of 1994-95, which it inexplicably did not, the Board could not have, without intervention from the judicial branch, acted alone to replace the enormous losses to the retirement system caused by the enactments of SB 1107 and SB 240. Even the rejected adjustments would have replaced only a fraction of the direct and immediate financial losses, and would have done nothing to restore the system to its historic level contribution system or compensate it for its ongoing losses which will continue into perpetuity under these measures."

*Walton Declaration:* PERS Assistant Executive Officer Robert Walton attested: "31. After the enactment of SB 240, the Board directed its staff to attempt to develop a method to 'recapture' the losses which would occur to the retirement system due to the one year's skipped payment. In addition, the Board voted to challenge the constitutionality of SB 1107 and SB 240.

"32. In response to the Board's mandate to staff to attempt to mitigate the losses caused by the delayed contributions, [PERS] staff recommended, and

the Board subsequently approved, a temporary State employer rate increase. This temporary rate increase would have mitigated some of the direct losses resulting from one year's skipped employer payment. This amount would have been paid by the State over a five-year amortization period, effective July 1, 1994.

"33. This 'five-year partial mitigation plan' was a straight-forward attempt to collect, in addition to other required contributions, the equivalent of a typical year's General Fund State contribution obligation to [PERS] (approximately $480 million) over a five-year period. To accomplish this recapture of the one-year's skipped payment, the Board approved a State employer rate contribution increase for payroll periods beginning July 1, 1994, continuing through June 30, 1999. Without such a relatively quick partial mitigation program, [PERS] actuaries have noted that the losses to [PERS] over long amortization periods will skyrocket. Even with increased employer contributions, whether normally amortized, or amortized under a quick recapture plan such as that rejected by the State in 1994, losses to the retirement fund will be substantial as a result of SB 240. . . .

"34. The Board attempted to work with representatives of the State to mitigate the losses caused by SB 1107 and SB 240. . . . However, after receiving the Board-approved, actuarially-determined rates which included this 5-year partial 'recapture' of losses, *the State reduced the Board-approved rates* by the amount the Board had approved for the five-year plan, thereby eliminating the Board's ability to mitigate some of the losses caused by SB 1107 and SB 240. . . . By taking this action, the State did not comply with [former] Government Code § 20750.905, which requires the Governor to include in the annual Budget Act the Board-approved rates and the Legislature to adopt them." (Original italics.)

Thus, the evidence showed that, regardless of any assumptions made in the legislative process, no provisions were made for mitigation with board input. Moreover, since the legislators operated on assumptions rather than securing actuarial input from the board, appellant is in no position to argue that the asserted good intentions of the legislators should control.

We conclude appellant fails to demonstrate mitigation of the impairment.

e. *Acquiescence*

Appellant argues the PERS Board acquiesced in Senate Bill No. 1107 and Senate Bill No. 240, because in prior years the Legislature made changes without challenge by the PERS Board. Appellant quotes the following language from a Senate Rules Committee analysis of Senate Bill No. 1107:

"The policy precedent for adopting quarterly and semiannual state employer contributions in arrears to PERS was set in SB 2465, Chapter 1251 statutes of 1990 and AB 702, Chapter 83, Statutes of 1991. Prior to these measures, all employer contributions were made monthly.

"The impact of this bill on the condition on funding in the PERF is substantial. Whether PERS is adequately funded, over-funded or over-funded [*sic*] depends on many variable economic and non-economic conditions. State employer contribution rates are likely to increase as a result of the employer contribution payment schedule changes."

However, that there was no challenge to past legislation—which had limited scope and duration, was offset by comparable advantage, and was accompanied by express findings of no adverse effect on actuarial soundness—does not mean PERS has thereby agreed to any and all future modifications, particularly those involving "in arrears" funding. Neither Senate Bill No. 2465 nor Assembly Bill No. 702 involved the kind of "in arrears" financing instituted by Senate Bill No. 1107 and Senate Bill No. 240. Neither Senate Bill No. 1107 nor Senate Bill No. 240 contains any provision for mitigation similar to that of Assembly Bill No. 702. Moreover, employees received a comparable new advantage in Senate Bill No. 2465 (benefits based on compensation for last 12-month period, as opposed to 36-month period), and Assembly Bill No. 702 included express legislative findings that the change from monthly to quarterly payments was on a one-time basis only and would be mitigated by an increase in employer contributions. No such legislative findings were made in this case.

Appellant's reliance on our decision in *Claypool* v. *Wilson, supra,* 4 Cal.App.4th at page 672, is unavailing. There, PERS members challenged among other things the constitutionality of the 1991 legislation (Assem. Bill No. 702) repealing three funded supplemental cost of living (COLA) programs and directing that the funds be used to offset contributions otherwise due from PERS employers. We said the moneys which initially funded the former supplemental COLA's were obtained from the reserve against deficiencies pursuant to "a finding by the PERS Board that the money could be so allocated *without* jeopardizing the actuarial soundness of the system." (*Claypool* v. *Wilson, supra,* 4 Cal.App.4th at p. 672, original italics.) The 1991 legislation contained an express legislative declaration agreeing with the Board's findings that the funds could be tapped without jeopardizing the actuarial soundness of the system. (*Ibid.*)

Here, there is no fund at issue about which the PERS Board has found that the fund itself could be tapped without jeopardizing actuarial soundness.

Thus, appellant's claim of PERS Board acquiescence is unavailing.

We conclude the six-month and twelve-month "in arrears" financing features of Senate Bill No. 1107 and Senate Bill No. 240 constitute impairments of contract. We now turn to the question whether the impairments are unconstitutional.

### 2. *The Impairments Are Not Constitutionally Permissible*

 Appellant contends that even if Senate Bill No. 1107 and Senate Bill No. 240 constitute impairments of contract, they are nevertheless constitutionally permissible. We disagree.

 "Not every impairment of a contractual right runs afoul of the contract clauses of the state and federal Constitutions. 'Although the Contract Clause appears literally to proscribe "any" impairment . . . "the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula." [Citations.] Thus, a finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution.' [Citation.] An attempt must be made to reconcile the strictures of the contract clause with the ' "essential attributes of sovereign power." ' [Citation.] For example, '[m]inimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.' [Citation.]" (*Valdes* v. *Cory, supra,* 139 Cal.App.3d at p. 789, citing *Allied Structural Steel Co.* v. *Spannaus* (1978) 438 U.S. 234 [98 S.Ct. 2716, 57 L.Ed.2d 727] and *United States Trust Co.* v. *New Jersey (U.S. Trust)* (1977) 431 U.S. 1 [97 S.Ct. 1505, 52 L.Ed.2d 92].)

### a. *The Impairment Was Substantial*

 Appellant argues any impairment was minimal, not substantial. We disagree.

We said in *California Teachers Assn.* v. *Cory, supra,* 155 Cal.App.3d 494: "An issue of prohibited impairment arises when the scope of the legislative impairment is not narrowly tailored to conform with an ostensible, innocent, governmental purpose. Accordingly, case law has given rise to the concept of permitted impairments as 'minimal impairments.' [Citation.] That is to say, the criterion of innocent purpose is that only the minimal impairment needed to attain the tendered legitimate public end has been visited upon the contracting parties. The concept of 'minimal impairments' has no proper application as a vague license for the state to impair its obligation so long as it is only 'a little bit.' " (*Id.* at p. 511.)

Appellant argues neither Senate Bill No. 1107 nor Senate Bill No. 240 constitutes a substantial impairment because (1) no obligations of the state

have been invalidated, released or extinguished, (2) any impact of the change in timing of appropriation and transfer of General Fund employer contributions is minimal, and (3) PERS members' reasonable expectations continue to be met. Appellant asserts full payment continues to be made albeit at a different time, and the Legislature intended to mitigate any investment losses through increases in the employer contribution rate.

In making this argument, appellant gives no citation to the record (in violation of California Rules of Court, rule 15(a)) and gives no facts to back up his assertions. We may disregard contentions not supported by a factual analysis. (*In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 672-673, fn. 3 [33 Cal.Rptr.2d 13].) Moreover, we see no evidence that Senate Bill No. 1107 and Senate Bill No. 240 were narrowly drawn measures necessarily incidental to an innocent purpose. Rather, the evidence discussed, *ante*, in connection with the finding of impairment, reflects the impairments were substantial. Indeed, the legislative history of Senate Bill No. 240 cited by appellant in connection with the mitigation issue (discussed *ante*) acknowledged "[PERS] will suffer a substantial revenue loss which would normally be derived from investment earnings."

We conclude the impairments were substantial.

### b. *Necessity Defense Not Shown*

Appellant argues that even if there is a substantial impairment, it is still constitutionally permissible under the theory of justification. We disagree.

"[A] substantial impairment may be constitutional if it is 'reasonable and necessary to serve an important public purpose.' " (*Valdes v. Cory, supra,* 139 Cal.App.3d at p. 790, citing *U.S. Trust, supra,* 431 U.S. at p. 25 [97 S.Ct. at pp. 1512-1513, 52 L.Ed.2d at p. 112].) In applying this standard, however, when the legislation at issue impairs public contracts, " 'complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised.' [Citations.]" (*Valdes v. Cory, supra,* 139 Cal.App.3d at p. 790.)

"Both the California and United States Supreme Courts have identified factors which may warrant legislative impairment of vested contract rights on the grounds of necessity: '(1) the enactment serves to protect basic interests of society, (2) there is an emergency justification for the enactment, (3) the enactment is appropriate for the emergency, and (4) the enactment is

designed as a temporary measure, during which time the vested contract rights are not lost but merely deferred for a brief period, interest running during the temporary deferment.' [Citations.]" *(Valdes v. Cory, supra,* 139 Cal.App.3d at pp. 790-791.)

"[*U.S. Trust, supra,* 431 U.S. 1 [97 S.Ct. 1505, 52 L.Ed.2d 92]] places the justification for an impairment of a contractual funding obligation under the light of strict scrutiny. [Citation.] It requires the state assert a compelling interest for the impairment. [Citation.]" *(California Teachers Assn. v. Cory, supra,* 155 Cal.App.3d at pp. 511-512.) The party claiming justification has the burden of establishing it. (See *Olson v. Cory* (1980) 27 Cal.3d 532, 539 [178 Cal.Rptr. 568, 636 P.2d 532]; *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 310 [152 Cal.Rptr. 903, 591 P.2d 1]; *California Teachers Assn., supra,* 155 Cal.App.3d at p. 512, fn. 14; *Valdes v. Cory, supra,* 139 Cal.App.3d at p. 791.)

Appellant suggests the United States Supreme Court would view the impairment in this case more leniently in appellant's favor than would California courts. However, appellant fails to demonstrate that federal courts would yield a different result than California courts under these facts.[24]

Appellant cites *El Paso v. Simmons* (1965) 379 U.S. 497 [85 S.Ct. 577, 13 L.Ed.2d 446]. In that case the court held a Texas statute governing forfeiture of public land sale contracts could be modified to impose a new five-year statute of limitations on certain claims, without violating the federal contract clause. The court's reasoning was that the affected parties could not seriously contend they had entered into any contracts on the basis of a right unencumbered by a statute of limitations. (*Id.* at p. 514 [85 S.Ct. at pp. 586-587, 13 L.Ed.2d at p. 458].) Such reasoning has no application in the public pension field, in which courts have held that secure funding is central to the employment bargain.

Appellant argues the federal cases relied upon in *Valdes* are no longer viable. We disagree. Thus, *Valdes* cited *U.S. Trust, supra,* 431 U.S. 1 [97 S.Ct. 1505, 52 L.Ed.2d 92], and *Allied Structural Steel Co. v. Spannaus, supra,* 438 U.S. 234 [57 L.Ed.2d 727]. *U.S. Trust* declared invalid a statute intended to abrogate a port authority's express covenant to its bondholders not to make unauthorized expenditures out of revenues designated for repayment of bonds. A year later, the *U.S. Trust* holding was applied in a private contract case in *Allied Structural Steel Co. v. Spannaus,* which struck down a Minnesota statute modifying pension payment obligations of private employers.

---

[24]We therefore need not decide whether the state Constitution provides independent grounds for relief.

Appellant argues the *U.S. Trust* standard was relaxed in *Energy Reserves Group* v. *Kansas Power & Light* (1983) 459 U.S. 400, 412-413 [103 S.Ct. 697, 704-706, 74 L.Ed.2d 569, 581], and courts will defer to legislative judgments as to the necessity and reasonableness of legislation challenged under the contract clause. However, *Energy Reserves,* dealt with *private* contracts and does not disturb the *U.S. Trust* doctrine which applies strict scrutiny to *public* contract impairments. *Energy Reserves* makes this very point: *"Unless the State itself is a contracting party* . . . 'courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.' " (*Energy Reserves Group* v. *Kansas Power & Light, supra,* 459 U.S. at pp. 412-413 [103 S.Ct. at p. 705, 74 L.Ed.2d at p. 581], italics added.) "When a State itself enters into a contract, it cannot simply walk away from its financial obligations. In almost every case, the Court has held a governmental unit to its contractual obligations when it enters financial or other markets. . . . In the present case, of course, the *stricter* standard of *United States Trust Co.* does not apply because Kansas has not altered *its own* contractual obligations." (*Energy Reserves Group* v. *Kansas Power & Light, supra,* 459 U.S. at p. 411, fn. 14 [103 S.Ct. at p. 705], italics added.) The Ninth Circuit has also made the public versus private contract distinction and continues to follow *U.S. Trust*: "[B]ecause *Energy Reserves Group* . . . did not involve impairments of public contracts, [it has] no direct effect on the Supreme Court's holding in [*U.S.*] *Trust* . . . [¶] . . . The Court's decision[] in *Energy Reserves Group* . . . do[es] not indicate that the Court would defer to state legislatures when public as opposed to private contracts are at issue. As the Court explained in [*U.S.*] *Trust* . . . , 'complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake.' [Citation.]" (*State of Nev. Employees Assoc., Inc.* v. *Keating* (9th Cir. 1990) 903 F.2d 1223, 1226 [invalidating state law which terminated right of public employees to withdraw pension contributions without penalty].)

Thus, *U.S. Trust* remains viable, and the deference urged by appellant is not appropriate in this case.

Citing *Energy Reserves, supra,* appellant asserts the federal test is merely whether the enactment has a significant and legitimate public purpose. However, *Energy Reserves* went on to say: "Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.' " (*Energy Reserves Group* v. *Kansas Power & Light, supra,* 459 U.S. at pp. 412-413 [103 S.Ct. at p. 705, 74 L.Ed.2d at p. 581].) This is consistent with *Valdes*'s statement that an enactment must be

"appropriate" for the emergency. (*Valdes* v. *Cory*, *supra*, 139 Cal.App.3d at p. 790.)

### i. *Statement of Decision*

Appellant contends the judgment should be reversed under a per se rule of reversal because the statement of decision was defective with respect to the controverted issue of the necessity defense, and this asserted defect was brought to the trial court's attention. We find no basis for reversal.

Appellant requested a statement of decision, specifying only seven controverted issues. The first two issues pertained to the California Constitution, article XVI, section 17, claim, not the contract clause claim. The last three issues dealt with laches, standing, and the propriety of directing payment of any sum from state funding sources. This leaves only the third and fourth issues. The third issue was: "Whether SB 240 unconstitutionally impairs vested contractual rights of [PERS] members in violation of Article I, Section 10, Clause 1 of the United States Constitution and Article I, Section 9 of the California Constitution." The remaining issue was: "Whether SB 1107 unconstitutionally impairs any vested contractual rights of [PERS] members in violation of Article I, Section 10, Clause 1 of the United States Constitution and Article I, Section 9 of the California Constitution."

The trial court issued a 20-page statement of decision explaining the factual and legal basis for finding that Senate Bill No. 1107 and Senate Bill No. 240 were unconstitutional impairments of contract. In its statement of decision, the trial court set forth the controlling law on the necessity defense, including the factors pertinent to the analysis, i.e., that the enactment (1) protect basic interests of society, (2) be justified by an emergency, (3) be appropriate for the emergency, and (4) be designed as a temporary measure. The statement of decision further stated that even if it were assumed that the record justified a finding of a fiscal emergency, the subject legislation was enacted without actuarial input from the board, and without indication that considered thought was given to possible mitigating measures, or to the possibility of alternative, less drastic means of accomplishing the goal of budget balancing.[25]

This explanation also appeared in the court's proposed statement of decision, to which appellant filed objections. Appellant's objection 11 stated: "The tentative decision at pages 20-21, paragraph 22, is silent

---

[25]The same paragraph also explained the court's decision that the interferences were substantial, not minimal. Contrary to appellant's implication, we see no problem with the trial court covering both matters in the same paragraph.

regarding respondent's legal analysis and evidence cited in the record with respect to a contract impairment still being constitutionally permissible pursuant to both federal and state tests. (See Consolidated Opposition Brief at pp. 46-50.)[26] The tentative decision simply states [quotation and paraphrase of statement of decision]. [¶] The tentative decision previously identified four factors 'which may warrant legislative impairment of vested contract rights on the grounds of necessity,' taken from the *Valdes* decision. The tentative decision also noted the ultimate *Valdes* test that impairment of rights may be warranted by an emergency serving to protect a basic interest of society. (Tentative Decision at pp. 11-12.) However, the trial court does not in paragraph 22 analyze or apply such factors, or the ultimate test, with respect to the law or the evidence in the record. Paragraph 22 is also ambiguous with respect to whether or not the court assumed or found the record justifies a finding of a fiscal emergency."

On appeal, appellant's argument is not clear. He contends the trial court failed properly to rule on the necessity defense. However, he never requested a statement of decision on the necessity defense. Thus, Code of Civil Procedure section 632 requires that a request for a statement of decision "shall specify those controverted issues as to which the party is requesting a statement of decision."

Appellant argues that, although he did not specify the necessity defense as a controverted issue, it should have been covered because it was a litigated issue and was a necessary part of the contract clause analysis.

However, assuming for the sake of argument that appellant is correct, the necessity defense *was* covered in the statement of decision. The statement of decision clearly rejected the necessity defense and explained why.

It is not clear whether appellant is arguing on appeal that the statement of decision was defective for failure expressly to address each factor pertinent to the necessity defense determination. We will assume appellant does intend to so argue, since he cites his objection to the statement of decision (which objected on this basis), and he cites Code of Civil Procedure section 634,[27] which precludes a reviewing court from drawing inferences favorable to a

---

[26]The consolidated opposition brief cited the four factors in a footnote but asserted they derived from outdated cases. Appellant argued the federal test was merely whether the enactment had a significant and legitimate public purpose, and the state test was whether the impairment was warranted by an emergency serving to protect a basic interest of society.

[27]Code of Civil Procedure section 634 provides: "When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court either prior to entry of judgment or in conjunction with a motion under Section 657 or 663, it shall not be inferred on

judgment where an omission or ambiguity was brought to the trial court's attention.

We do not believe the statement of decision is fatally defective for failure expressly to address factors pertinent to the necessity defense. Thus, Code of Civil Procedure section 632 requires only that the statement of decision "explain[] the factual and legal basis for [the trial court's] decision as to each of the principal controverted issues . . . ." Here, the statement of decision set forth the factors pertinent to the necessity defense: The enactment (1) protects basic societal interests, (2) is justified by an emergency, (3) is appropriate for the emergency, and (4) is temporary. The court then assumed a fiscal emergency but found the legislation was enacted without obtaining actuarial input from the PERS Board and without considered thought as to possible mitigating measures or less drastic alternatives. Thus, while not using the word "appropriate," the court plainly found an absence of the factor that the enactment must be appropriate for the emergency. Nothing more was required. We conclude the statement of decision is not fatally defective for failure expressly to address factors pertinent to the necessity defense.

Appellant complains the trial court assumed in his favor the existence of an emergency, rather than making a finding of emergency. However, if appellant means to argue the trial court's assumption renders the statement of decision fatally defective, he fails to cite any authority for that proposition.

To the extent that appellant sought a statement of evidence supporting the decision, we note evidentiary facts are not required in a statement of decision; a statement of ultimate facts suffices. (7 Witkin, Cal. Procedure, *supra*, Trial, § 403, pp. 406-407.)

We conclude appellant fails to show any grounds for reversal based on asserted defects in the statement of decision.

### ii. *No Error Shown Re: Necessity Defense*

Appellant contends the necessity defense applies. We disagree.

On appeal, appellant asserts the four factors set forth in *Valdes* (protection of societal interest, existence of an emergency, appropriateness of the enactment as a response to the emergency, and temporary duration of the impairment) are not all essential to finding of necessity. Thus, he cites *Energy*

appeal or upon a motion under Section 657 or 663 that the trial court decided in favor of the prevailing party as to those facts or on that issue."

*Reserves Group* v. *Kansas Power & Light, supra*, 459 U.S. at page 412 [103 S.Ct. at pages 704-705, 74 L.Ed.2d at page 581], which indicated that neither the existence of an emergency nor temporary duration of impairment is required. PERS responds an emergency and temporary duration are still required for impairment of *public* contracts. While appellant appears to be correct (see *U.S. Trust, supra*, 431 U.S. at p. 23, fn. 19 [97 S.Ct. at p. 1517, 52 L.Ed.2d at p. 110]), we need not resolve the matter because (1) regardless of whether or not an emergency is *required* as justification for an impairment, emergency was the justification proffered by appellant in this case, and (2) the judgment in this case may be affirmed even assuming in appellant's favor that temporary duration is not a required element of a necessity defense.

Appellant contends Senate Bill No. 1107 and Senate Bill No. 240 were constitutionally permissible. As evidence of a "public purpose," he cites language in the enactments. Thus, Senate Bill No. 1107 stated it was necessary that the act take effect immediately "[i]n order for this act to take effect upon the commencement of the fiscal year, and to facilitate the orderly administration of public retirement systems . . . ." (Stats. 1992, ch. 707, § 7.) Senate Bill No. 240 stated it was necessary that the act take effect immediately "[i]n order that a response may be made to the current fiscal emergency of the state at the earliest possible time . . . ." (Stats. 1993, ch. 71, § 3.) According to appellant, we must defer to these legislative determinations. However, we have explained that deference is not appropriate on a contract clause matter where the state's own interests are at stake.

Appellant devotes copious detail to evidence of a fiscal emergency and argues Senate Bill No. 1107 and Senate Bill No. 240 meet the "significant and legitimate public purpose test" as urgency measures in a "fiscal emergency."

We will assume for the sake of argument that appellant has sufficiently shown the existence of a fiscal emergency.

That leaves the question whether the enactments were appropriate for the emergency. We will conclude they were not, even under a de novo standard of review.

Appellant contends Senate Bill No. 1107 and Senate Bill No. 240 were moderately and narrowly tailored. As support, he asserts it could have been worse—more drastic action could have been taken, such as modifying pension benefits. However, the test is not whether it could have been worse. The question is whether it could have been better, i.e., whether there were less drastic alternatives.

Appellant cites evidence of budget cuts and other measures taken in areas unrelated to PERS, e.g., cuts in health, education and welfare programs,

hiring freezes in state departments, and increases in the sales tax and personal income tax rate. Appellant also points out 1991 legislation (Assem. Bill No. 702) repealed a particular purchasing program (IDDA/EDPA) and redirected funds to offset the state's employer contributions, and this offset was assertedly being implemented at the time in question. Contrary to appellant's assertion, this does not establish consideration of or lack of other alternative means with respect to Senate Bill No. 1107 or Senate Bill No. 240. Moreover, appellant cites no evidence of any effort to deal narrowly with the exigencies of the emergency or of consideration of other less drastic alternatives within the PERS system. Indeed, there was not even any actuarial input from the PERS Board. Where the state has not shown that it gave "considered thought to the effect the emergency provisions might have on PERS or the possibility of alternative, less drastic, means of accomplishing its goal," then the necessity defense fails. (*Valdes* v. *Cory, supra*, 139 Cal.App.3d at p. 791.) Since actuarial input from the PERS Board was not obtained, that showing cannot be made.

Appellant invokes the state's sovereign right to protect the general welfare of the people. (*El Paso* v. *Simmons, supra*, 379 U.S. at p. 508 [85 S.Ct. at pp. 583-584, 13 L.Ed.2d at p. 454].) However, ". . . the power of a state to modify or affect the obligation of contract is not without limit." (*Id.* at p. 509 [85 S.Ct. at p. 584, 13 L.Ed.2d at p. 455].) The state's power is subject to the limitation of the foregoing standards.

We conclude the six-month and twelve-month "in arrears" financing feature of Senate Bill No. 1107 and Senate Bill No. 240 are both unconstitutional impairments of contract.

3. *Both Senate Bill No. 1107 and Senate Bill No. 240 Are Invalid*

Under a separate heading in his brief, appellant argues that even if Senate Bill No. 240 is held unconstitutional, Senate Bill No. 1107 is valid because of distinctions in the circumstances of the two enactments. However, appellant merely reiterates arguments we have already addressed.

We conclude the six-month and twelve-month "in arrears" financing feature of Senate Bill No. 1107 and Senate Bill No. 240 are invalid as violative of the contract clauses of the federal and state Constitutions. Therefore, the immediately preceding version of section 20822 (former § 20751, enacted by Stats. 1990, ch. 463, § 3)[28] must stand "as the only valid expression of the legislative intent" pursuant to both federal and state

---

[28]The operative version provides: "From the General Fund in the State Treasury there is appropriated quarterly to the Retirement Fund the state's contribution for [specified PERS members]." (Stats. 1990, ch. 463, § 3.)

principles. (*Frost* v. *Corporation Commission of State of Oklahoma* (1929) 278 U.S. 515, 526-527 [49 S.Ct. 235, 239, 73 L.Ed. 483, 490]; *Danskin* v. *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536, 554-555 [171 P.2d 885]; *Valdes* v. *Cory, supra,* 139 Cal.App.3d at p. 792; see also 1A Sutherland, Statutory Construction (5th ed. 1993) § 22.37, p. 314.)

## V. *Writ Was Not Prejudicially or Prematurely Issued*

Appellant contends the writ was prejudicially and prematurely issued. We disagree.

Appellant argues that, pursuant to the constitutional doctrine of the separation of powers, a court may not issue mandate to compel appropriations. (Cal. Const., art. III, § 3;[29] *Butt* v. *State of California* (1992) 4 Cal.4th 668, 697-703 [15 Cal.Rptr.2d 480, 842 P.2d 1240] [funds must be appropriated and available in order for court to order payment]; *Mandel* v. *Myers* (1981) 29 Cal.3d 531, 542 [174 Cal.Rptr. 841, 629 P.2d 935]; *City of Sacramento* v. *California State Legislature* (1986) 187 Cal.App.3d 393, 396-399 [231 Cal.Rptr. 686].)

According to appellant, by statute the State General Fund employer contribution is appropriated and paid on the same day, e.g., July 1st of the following fiscal year. (§ 20822.) However, the trial court (in its statement of decision filed January 11, 1995) found the employer contributions for the 1994-1995 fiscal year had already been appropriated, though the state did not plan to pay them until July 1996. The trial court also found contributions appropriated in the 1993-1994 Budget Act had not yet been paid. Citing *Butt* v. *State of California, supra,* 4 Cal.4th 668, and *Mandel* v. *Myers, supra,* 29 Cal.3d 531, the trial court commanded the transfer to the fund of employer contribution amounts which were appropriated in the 1993-1994 and 1994-1995 Budget Acts but which were unpaid as of the date of trial.

Appellant in his opening brief raises no substantial evidence challenge to the trial court's findings that the contributions had been appropriated. In his reply brief, he does dispute the matter and for the first time argues no substantial evidence supports the trial court's finding that funds had been appropriated. We will not entertain new points raised for the first time in a reply brief. (*Neighbours* v. *Buzz Oates Enterprises, supra,* 217 Cal.App.3d at p. 335, fn. 8.)

Appellant argues in his opening brief that the funds must be not only appropriated but also "available." (*Butt* v. *State of California, supra,* 4

[29]California Constitution, article III, section 3, provides: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

Cal.4th at p. 698; *Mandel* v. *Myers, supra,* 29 Cal.3d at pp. 543-544.) He says nothing in the record establishes any appropriation would be available for payment of State General Fund employer contributions in a different fiscal year.

We agree with PERS, however, that the earmarking of the appropriations for the express purpose of paying retirement contributions satisfies the availability test. The problem of availability arises when the cost item at issue falls within a category of appropriation which may have already been exhausted by payment of other expenses within the same budget item category. Thus, *Mandel* involved court-awarded attorney's fees, which fell within a budget item for "operating expenses." (*Mandel* v. *Myers, supra,* 29 Cal.3d at pp. 542-543.) The category "operating expenses" plainly encompasses other types of expenditures and it was thus necessary that there be money left in that budget item in order for the court to order payment. *Butt* involved an attempt to get the court to order diversion of funds from appropriations clearly intended for other purposes. (*Butt* v. *State of California, supra,* 4 Cal.4th at pp. 674, 701-702.)

Here, the funds were clearly earmarked for the sole purpose of contributions to the retirement fund. We conclude no further showing of availability was required.

Appellant argues that even if this court rejects his impairment arguments, the writ must still be reversed and the matter remanded with directions for de novo proceedings regarding (1) the specific amount and the timing of the transfer, and (2) the effect of such transfer upon other state appropriations due to the "trigger bill" (Stats. 1994, ch. 135), which assertedly will require reductions in other state appropriations if the state's cash resources are decreased by more than $430 million before the July 1, 1996, expiration of the trigger bill.

However, we do not believe remand is required. The amounts are clearly ascertainable from the budget acts, and appellant does not argue to the contrary. The timing also appears to us to be clear from the statement of decision, judgment, and writ. As to the "trigger bill," appellant fails to provide any legal analysis but appears to argue the trigger bill somehow renders the judgment a violation of the separation of powers doctrine. We disagree. Appellant asserts the trigger bill (which applies only to the 1994-1995 and 1995-1996 fiscal years) provides that if the state's cash resources decrease by more than $430 million during those fiscal years, legislation must be adopted to address the shortfall that exceeds the $430 million threshold, either by expenditure reductions or revenue increases or both.

(Stats. 1994, ch. 135.) According to appellant, payment of the judgment in this case would trigger this requirement. However, this requirement was imposed by the Legislature, not by the court. We therefore see no separation of powers issue.

Appellant also argues the writ was premature because California Constitution, article III, section 3.5,[30] assertedly requires that state officials enforce statutes until there is a final decision of a court of appeal declaring the statute unenforceable. However, our resolution of this appeal renders appellant's concern moot.

## Disposition

The judgment is affirmed. Respondents shall recover their costs on appeal.

Davis, J., and Raye, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 28, 1997. Brown, J., did not participate therein.

---

[30]California Constitution, article III, section 3.5, provides in part: "An administrative agency, including an administrative agency created by the Constitution or an initiative statute, has no power: [¶] (a) To declare a statute unenforceable, or refuse to enforce a statute, on the basis of it being unconstitutional unless an appellate court has made a determination that such statute is unconstitutional . . . ."